[Crim. No. 330. Third Appellate District.—January 21, 1916.]

## THE PEOPLE, Respondent, v. JOSEPH D. CORNELL, Appellant.

CRIMINAL LAW—FORGERY—EVIDENCE—EFFECT OF ADMISSIONS.—In a prosecution for forging the names of two persons to the promissory note of the defendant, given to evidence the indebtedness of the defendant to the complaining witness of a certain sum of money which the latter had intrusted to the defendant to be loaned out by him on mortgage securities, and which he had improperly used in furthering a certain resilient tire scheme which he was promoting, it is not error to permit the state to prove the original intrusting of the money to the defendant for loan purposes, nor to prove a conversation had the day before the delivery of the note wherein

the defendant admitted that he had falsely stated to the complaining witness that he had loaned the money upon mortgages, whereas he had in truth used the same for his own private business purposes, notwithstanding the admission by defendant's counsel preceding the opening statement of the district attorney that the sole defense to the charge would be that the defendant had authority to sign the names to the note, and the further admission, when the complaining witness was placed upon the stand, that the note was given as evidence of an antecedent debt.

Id.—Motive—Proof of Other Offenses.—Whenever the question of motive, or purpose, or reason for an act is involved, testimony showing such motive, reason, or purpose is always admissible, even though it may establish the commission of other offenses.

Id.—Authority to Sign Note—Evasive Answer—Further Interrogation—Right of State.—Where one of the persons whose name was forged is placed upon the stand by the state and makes evasive answer as to whether he had authorized the defendant to sign his name, it is not prejudicial error to permit the district attorney over objection to further interrogate the witness upon the subject.

Id.—Misconduct of District Attorney—Examination of Defendant —Misspending of Other Moneys—Admonition to Disregard.— It is improper to ask the defendant on cross-examination as to whether or not he had not spent a great deal of money that he got from other people in the tire business in which he was engaged, but such misconduct is not prejudicial where the jury was promptly directed to disregard the question and not to draw any inference therefrom.

Id.— Instructions — Acts of Defendant — Drawing of Different Conclusions—Duty of Jury.—It is not error to refuse to instruct the jury to the effect that the law presumes innocence, and where two conclusions may be drawn from the defendant's acts the jury must find him not guilty, where the court gave instructions which covered in substance the only theories involved in the case to which the refused instructions could apply.

Id.—Verdict—Return for Correction—Waiver.—Where at the time a verdict is returned no question is raised as to its form or sufficiency, and the objection is first presented to the trial court upon the defendant's motion for a new trial, the question whether the court should or should not have returned the verdict to the jury and directed reconsideration, as provided by section 1161 of the Penal Code, is not presented for consideration.

Id.—Sufficiency of Verdict.—A verdict in such a prosecution in the following form is sufficient, to wit: "We, the jury in the above-entitled cause, find the defendant guilty of the crime of forgery, as charged in the indictment, of the promissory note set forth in the indictment; and we further find that said defendant forged the name of C. O. Cartwright to said promissory note, as charged in

the indictment; and we further find the defendant guilty of uttering and passing the forged promissory note as charged in the indictment."

Id.—Language of Verdict.—It is not essential that the language of a verdict should follow the strict rules of pleading or be otherwise technical, for whatever conveys the idea to the common understanding will suffice, and all fair intendments will be made to support it.

Id.— Forgery of Two Names — Evidence — Sufficiency as to One Name—Verdict.—In such a prosecution the finding of the jury that the defendant was guilty of forging one of the two names to the note in question is sufficient to support the judgment, notwithstanding the evidence is insufficient to support a verdict that he was guilty of forging the other name thereto.·

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. Malcolm C. Glenn, Judge.

The facts are stated in the opinion of the court.

Theodore A. Bell, A. L. Hart, and R. L. Shinn, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PLUMMER, J., *pro tem.*—The defendant was convicted of the crime of forgery; appeals from the judgment of conviction, also from the order denying his motion for new trial, and assigns as reasons therefor the following grounds, to wit: 1st. Errors in the admission of testimony tending to show the commission of a prior offense; 2d. Misdirection of the jury in matters of law, including the refusal to give certain instructions requested by the defendant; and 3d. That the verdict returned by the jury is insufficient, both in form and substance, to sustain the judgment.

It appears from the testimony set forth in the transcript that some time during the year 1910, while the defendant, among other things, was engaged in loaning money for clients, one Maria Jansen called upon the defendant and left with him the sum of seven thousand six hundred dollars to be loaned out upon mortgage securities. Not having received any notes or mortgages from the defendant, Mrs. Jansen, in company with her uncle, Lauridson, called upon the defendant

at his office in Sacramento the sixth day of October, 1913, and asked the defendant for the mortgage, or mortgages, upon the security of which her money had been loaned. The defendant replied that the mortgages were in the recorder's office. Mrs. Jansen and her uncle, Lauridson, repaired to the recorder's office, and, failing to find any such instrument, or instruments, of mortgage, returned to the defendant's office and stated such fact to him. After some conversation then had, the defendant told Mrs. Jansen and her uncle that he had lied about the mortgages, that the money had not been loaned, that he had used it himself in furthering a certain resilient tire scheme which he was promoting, and promised to give Mrs. Jansen a note for the amount of money which he had used, signed by himself, his father, and one Dr. C. O. Cartwright. To this arrangement Mrs. Jansen consented. The defendant further stated that if Mrs. Jansen would return on the following morning he would have the note signed and ready for delivery. Upon the return of Mrs. Jansen on the following morning the defendant delivered to her a note dated October 7, 1913, for the sum of seven thousand six hundred dollars, to which was attached the names of the defendant, James Cornell, and C. O. Cartwright.

The indictment alleges that the names, James Cornell and C. O. Cartwright, were forged, and upon such charge the defendant went to trial and was found guilty.

The opening statement of the district attorney included, in substance, what has heretofore been recited, and was objected to in so far as it referred to the placing of the sum in the hands of the defendant by the witness Jansen, and also as to the conversation or relation of matters which took place between the defendant and the witnesses Jansen and Lauridson on the sixth day of October, 1913, by reason of an admission made by counsel for the defendant preceding such opening statement, and the introduction of any testimony, such statement being as follows:

"Mr. Bell: May it please the court, before any statement is made by the district attorney in this case, and before the testimony or evidence is introduced on behalf of the prosecution, the defendant desires that it be made a matter of record in this court that his sole defense to this charge is that he had authority from James Cornell and C. O. Cartwright to sign their names to the note in question, and the defendant

will rest upon that as his sole defense." And, further, when the witness Jansen was placed upon the witness-stand, the further admission: "Mr. Bell: Now, we can save a good deal of time, I think, and clear up the atmosphere. There will be no dispute that this note was given by the defendant to the witness upon the stand on October 7, 1913, as evidence of an antecedent debt, and I claim that any evidence prior to that time could not be admitted upon any other theory than to show that there was an antecedent debt of seven thousand six hundred dollars, for which the note was made, thereby showing that the note was given for the full consideration."

It is apparent from this statement that the testimony of the witnesses Jansen and Lauridson that seven thousand six hundred dollars was prior to the execution of the note in question placed in the hands of the defendant, in and of itself would be no more than simply a confirmation of the admission by the defendant of the creation, and, therefore, existence, of an antecedent debt in the event that the defendant used such money for his own purposes. The existence of the debt being admitted, it is not very easy to perceive why the circumstances of the creation of that debt could be harmful to the defendant, or upon what theory the prosecution would be excluded from proving the facts just admitted by the defendant, in the event it did not wish to rely entirely upon such admission.

The testimony of the witnesses that the sum of seven thousand six hundred dollars was placed in the hands of the defendant in 1910 for the purpose of being loaned out on mortgage securities did not, of itself, prove any embezzlement; it simply established the naked fact of the money having been placed in the defendant's possession for a particular purpose.

On the sixth day of October, 1913, when the witnesses Jansen and Lauridson called upon the defendant and asked for the mortgages upon which such money was to be loaned, a conversation was had between the defendant and said witnesses, in which all the facts, practically, stated by the district attorney in his opening statement were gone over, and the defendant then and there promised to give, and did thereafter give, the note in question. This conversation did tend to show that the defendant had embezzled the money theretofore left with him by the witness Jansen. Such conversation, and the occurrences then and there had, constituted the reason and

the inducing cause for the execution and delivery of the note which the defendant then and there stated he would have signed and ready for delivery to the witness Jansen on the following morning.  It is clear that all that took place between the defendant and the witnesses Jansen and Lauridson on the sixth day of October, which led to the giving of the note and was consummated by the delivery of the note on the following morning, constituted but one transaction, and, irrespective of whether it tended to show the defendant guilty of a prior offense, was a part of the *res gestae,* and admissible in testimony to show the circumstances attending the giving of the note.

The defendant relies strongly upon the decision in the case of *People* v. *King,* 23 Cal. App. 259, [137 Pac. 1076], wherein the undisputed rule that proof of an offense distinct from and wholly disconnected with the particular crime charged, against a defendant is not admissible in evidence, is set forth and applied.  In that case the defendant was charged with embezzlement.  The defendant admitted the receipt of the money, and set up in defense that he had returned the same.  Notwithstanding such defense and admission made by the defendant at the beginning of the trial, the prosecution was allowed to prove other distinct acts of embezzlement.  We do not see that there is any necessity for either criticising or approving the decision in the King case, as it is readily distinguishable from the one at bar.  The circumstances of previous embezzlement by the defendant King had nothing to do with the *actual* embezzlement of the moneys for which he was being tried, and which it was claimed by him he had returned to the owner thereof.

In the case at bar, the testimony as to prior offense admitted is the conversation had between the defendant and the witnesses Jansen and Lauridson on the day preceding the giving of the note about the deposit or leaving with the defendant of certain moneys to be loaned on mortgages, inquiry for said mortgages, admission by the defendant that no such mortgages were ever taken, after having stated that such mortgages were in the recorder's office, the further admission by the defendant that he had used the money; a statement by one of the witnesses that the defendant might be sent to prison for such offense, and the offer by the defendant to give the note for the forging of which he was tried and convicted.

The King case and others, following the rule therein laid down, wherein testimony as to other offenses is held inadmissible, rests upon an entirely different state of circumstances, such testimony being excluded only when the offenses are disconnected, and, whether the testimony as to the leaving of the seven thousand six hundred dollars with the defendant in 1910, as related by the witnesses, before anything was said of the conversation had between the defendant and the witnesses on October 6th, was or was not admissible, the defendant was not prejudiced thereby, because all the facts showing his prior embezzlement of the moneys are included in the circumstances occurring on the 6th of October, upon which the note involved in this case is based.

Again, whenever the question of motive, or purpose, or reason for an act is involved, testimony showing such motive, reason, or purpose is always admissible, even though it may establish the commission of other offenses. (*People* v. *Soeder,* 150 Cal. 12, [87 Pac. 1016] ; *People* v. *Argentos,* 156 Cal. 720, [106 Pac. 65] ; *People* v. *Sanders,* 114 Cal. 216, [46 Pac. 153] ; *People* v. *Cook,* 148 Cal. 340, [83 Pac. 43] ; *People* v. *Hatch,* 163 Cal. 368, 378, [125 Pac. 907] ; *People* v. *McPherson,* 6 Cal. App. 266, [91 Pac. 1098] ; *People* v. *Courtright,* 10 Cal. App. 522, [102 Pac. 542] ; *People* v. *Mack,* 14 Cal. App. 12, [110 Pac. 967].)

A large number of other cases might be cited, but these will suffice to illustrate the point in controversy, and, in our opinion, clearly establish the admissibility of the testimony referred to.

During the course of the trial the defendant's father, James Cornell, was placed upon the witness-stand by the prosecution and asked as to whether he had or had not authorized the defendant to sign his name to promissory notes. The witness not answering the question directly, or rather having answered in a more or less evasive manner, the district attorney proceeded to interrogate the witness further, over the objection of the defendant that the prosecution was cross-examining its own witness, and that the cross-examination was for the purpose of discrediting the testimony of the witness and inducing the jury to disbelieve his statements. While the ruling of the court in this particular may have been technical error, a reading of the testimony of the witness James Cornell does not disclose anything really prejudicial, and, in view of the

decision in the case of *People* v. *Leyshon,* 108 Cal. 440–446, [41 Pac. 480], which will be further discussed herein, it is clear that the defendant suffered no injury from the course of the district attorney in this particular, or of the ruling of the court in relation to such testimony.

Misconduct on the part of the district attorney is assigned as having occurred in the course of his cross-examination of the defendant. The transcript shows the following: "Mr. Jones: Question. How long have you been engaged in this business—this tire business? Answer: Well, it has been several years. It was early in 1910. It might have been in 1909 —the latter part of 1909—when that proposition was first presented to me. Question: You have spent a great deal of money in it? Answer: Yes. Question: Spent a great deal of money that you have got from other people in it?" The asking of this question was assigned as error, and in the course of the colloquy that ensued, the court stated the matter as follows: "He [referring to the defendant] stated that so far as one of the persons is concerned—that is, Mrs. Jansen— he spent her money. As to any other person, Mr. Jones, your question is improper," and, after an apology by the district attorney, instructed the jurors to pay no attention to the question. The question, in and of itself, does not directly assume that the defendant had improperly spent any money belonging to others, and the jury having been promptly directed by the court not to pay any attention to the question or to any inference that might be drawn therefrom as to any other moneys, we do not think that the defendant was materially prejudiced. That the act of the district attorney was not sufficient to warrant reversal, we refer to *People* v. *Glaze,* 139 Cal. 159, [72 Pac. 965] ; *People* ˌv. *Lawrence,* 143 Cal. 148, 156, [68 L. R. A. 193, 76 Pac. 893]. The question by the district attorney of the defendant, as to whether he had not spent considerable money in riotous living, was not objected to, and, therefore, need not be considered. Other objections were also urged against the admission of certain testimony, but they do not seem to be of sufficient importance to require any statement herein.

In behalf of the defendant's second assignment of reasons for reversal it is argued with considerable insistence that the court erred in instructing the jury, and especially in the refusal to give defendant's proposed instructions numbered

7 and 8. Defendant's proposed instruction No. 7 is as follows: "You are instructed that if the testimony in this case in its weight and effect be such that two conclusions *cannot* be reasonably drawn from it, the one favoring defendant's innocence and the other tending to establish his guilt, the law demands that the jury shall adopt the former and find the defendant not guilty." (Assuming that the word "cannot" was a clerical error and should have been corrected by the court to read "can," we will consider the instruction in its corrected form.) .

Defendant's proposed instruction No. 8 reads: "You are instructed that when, from the evidence, a man's conduct may be as consistently and reasonably referred to, two motives, one criminal, the other not criminal, the law will ascribe it to that which is innocent, and it is your duty to so find."

These two instructions, while different in form and language, convey practically the same idea, to wit, that the law presumes innocence, and where two conclusions may be drawn from a defendant's acts, the jury must find him not guilty.

Was it error on the part of the court to refuse said proposed instructions?

Instruction No. 41 proposed by the defendant and given by the court reads as follows: "In this case, C. O. Cartwright has testified that the defendant had no authority to sign his name to said promissory note. I instruct you that you are sole judges of the fact as to whether the defendant had authority so to do, or believed that he had such authority, and unless you feel an abiding conviction to a moral certainty that the defendant did not have such authority and did not believe that he had such authority, then you must find the defendant not guilty."

Further, defendant's proposed instruction No. 37, given to the jury by the court, reads: "I charge you that if after an entire comparison and consideration of the evidence in this case you entertain a reasonable doubt as to whether the defendant and C. O. Cartwright became partners, and that defendant signed the name of C. O. Cartwright to said promissory note, believing that he had the right to sign the name of C. O. Cartwright as his business associate or partner, then you must find the defendant not guilty."

Defendant's proposed instruction 38 on the same point, and given by the court, is as follows: "If the defendant be-

lieved that he had the right to sign C. O. Cartwright's name to said promissory note by reason of the claim made by the defendant that he and said Cartwright were associated together in business, then I charge you that such belief destroys all criminal intent, and you must find the defendant not guilty.''

Further instructions given by the court were to the same tenor and import as these just recited. The two theories upon which the case was tried, by the admission of the defendant through his counsel at the beginning thereof, were, on behalf of the prosecution, that the defendant had no authority to sign the names as signed in the note, and, on the part of the defense, that he was so authorized, and it was these matters which the instructions just recited directly and forcibly instructed the jury that they must ascertain and find from the evidence against the defendant beyond a reasonable doubt before a verdict of guilty would be justified. There were no other theories involved in the case to which the refused instructions 7 and 8 could possibly apply, and, being covered, in substance, by the instructions given, no prejudice was occasioned by their refusal.

The jury was further instructed: ''That every material allegation in the indictment must be established to the satisfaction of the jury beyond all reasonable doubt; that the jury should take into consideration only the evidence, and should disregard and discard from their minds every impression or idea suggested by questions asked by counsel which were not allowed to be answered, and, further, that the presumption of innocence continued through the trial and until the jurors were convinced to a moral certainty and beyond all reasonable doubt of the guilt of the defendant.''

Upon the question as to whether a partnership existed between the defendant and C. O. Cartwright, and whether the defendant did or did not have a right to sign the name of the said C. O. Cartwright to the note in question, as such partner, the jury was fully instructed. Also the jury was clearly and pointedly instructed that the defendant could not be found guilty of the offense charged because he might have been guilty of misappropriating the moneys belonging to the witness Jansen.

It may be here proper to remark that the trial court, after once instructing the jury clearly upon the points involved in

the case, was not required to repeat the instructions with all the variableness and shadows of turning possible to skillful and learned attorneys.

Forty-four distinct and separate instructions were asked for by the defendant in this case, which necessarily devolved upon the trial court the duty of sifting out and excluding a large number of them, even though they might be correct statements of the law, as most of them constituted only repetition of what had already been given, with variations in language.

The third reason assigned as grounds for reversal is as to the sufficiency in form and substance of the verdict. It is as follows:

"People of the State of California  
versus  
Joseph D. Cornell.

"We, the jury in the above-entitled cause, find the defendant guilty of the crime of forgery, as charged in the indictment, of the promissory note set forth in the indictment; and we further find that said defendant forged the name of C. O. Cartwright to said promissory note, as charged in the indictment; and we further find the defendant guilty of uttering and passing the forged promissory note as charged in the indictment.

"ROBERT E. CLARK, Foreman."

No question was raised at the time of the return of the verdict as to its form or sufficiency, and it was first presented to the trial court upon the defendant's motion for new trial; hence, whether the court should or should not have returned the verdict to the jury and directed the jury to reconsider the same, as provided by section 1161 of the Penal Code, is not presented for consideration. Section 1150 of the Penal Code provides that "the jury may render a general verdict, or, when they are in doubt as to the legal effect of the facts proved, they may, except upon a trial for libel, find a special verdict." Section 1152 of the same code defines a special verdict as one "by which the jury find the facts only, leaving the judgment to the court."

The appellant insists that the court erred in submitting a special form of verdict to the jury. An examination of the sections above referred to shows that there is nothing in this

claim. There is nothing in the verdict, which is special in
its nature, as defined by section 1152 of the Penal Code.
There is a clause in the verdict which is particular, as language
is ordinarily understood, in its reference to the defendant
having forged the name of C. O. Cartwright. A special ver-
dict is one which simply finds the facts. To have made this
verdict special, under the definition contained in the code, it
must have set forth the facts of the defendant signing the
name of Cartwright without authority, etc., but, instead of so
doing, the jury finds the general fact of forgery, in that the
defendant forged a particular name. Is the verdict sufficient
to support the judgment?

Looking at the verdict and reading it as a whole, it is clear
that the jury intended to find the defendant guilty of forgery,
as charged in the indictment, in this, to wit: That he forged
the name of C. O. Cartwright to the instrument set forth in
the indictment, and thereafter uttered and passed the same
as charged.

Bishop, in his Criminal Procedure, second edition, section
1005a, speaking of verdicts, says: ''The language of the ver-
dict, being that of lay people, need not follow the strict rules
of pleading or be otherwise technical. Whatever conveys the
idea to the common understanding will suffice, and all fair
intendments will be made to support it. As in an indict-
ment or a pleading bad grammar or spelling does not vitiate,
so, *a fortiori*, it does not in the verdict unless the meaning
becomes inadequate. Surplusage is harmless. The finding
must be construed as a whole, not in its separate parts.''

In *People* v. *Brady*, 6 Cal. Unrep. 719, [65 Pac. 824], the
court says: ''Where the intention of the jury is unmistakable,
mere clerical error should be disregarded.'' In *People* v.
*Jochinsky*, 106 Cal. 640, [39 Pac. 1077], the verdict was as
follows: ''We, the jury, find the defendant guilty of bur-
glary in the first degree; we find that the goods taken from
Prince's store on the night of the 13th and 14th of April,
1893, were brought from Sonoma county into the City and
County of San Francisco, State of California, by the defend-
ant.'' The objection there was that the verdict was both
general and special, and that it was faulty because it did not
specify where the burglary was committed. The objection
was held invalid. In *State* v. *Bowen*, 16 Kan. 476, the verdict
returned by the jury read: ''We, the jury, find the defendant

not guilty in manner and form as charged in the information, but do find him guilty of manslaughter in the second degree." Upon this the defendant moved to be discharged on the ground that murder includes all the degrees of manslaughter, and the first part of the verdict finding him not guilty in manner and form as charged was responsive to all the charges, and acquitted him of guilt not only of murder but as to all the degrees of manslaughter, and therefore the latter part of the verdict should be disregarded as surplusage. The court held the point not well taken, and that the verdict must be taken as a whole, and its meaning determined from a consideration of every part, and, when so taken, there was no chance for misconception as to the meaning of the jury, and that it found him guilty of the crime of manslaughter.

In *Kimball* v. *Territory,* 13 Ariz. 310, [115 Pac. 70], the court says: "Where the intention to convict of crime is unmistakably expressed in the verdict, any mere irregularity or surplusage contained therein is immaterial." In that case, however, the verdict simply found the defendant guilty of obtaining property by false representations, without finding him guilty of any intent to defraud, which constituted a necessary part of the crime.

In *People* v. *Gilbert,* 57 Cal. 96, the verdict was: "We, the jury, find the defendant guilty as indicted to the sum of $90." The defendant was charged with the crime of embezzlement. The reference in the verdict was held to make it explicitly appear that the jury found him guilty of embezzlement, and that they further found that the sum embezzled was $90, and the verdict held legally sufficient.

In *State* v. *Arbruzino,* 67 W. Va. 534, [68 S. E. 269], a verdict was returned in the following form: "We, the jury, find the defendant, Tonio R. Arbruzino, not guilty of the felonious and malicious assault charged in the within indictment with the intent therein charged, but we do find him guilty of the unlawful assault charged with the intent therein also charged." The court held that what the jury meant was to be ascertained by reference to the indictment, and that the verdict should always be read in connection therewith, and if it be certain, upon reading them together, what the meaning of the verdict may be, it is sufficient. (Citing a number of authorities.)

In the same volume, 68 S. E., on page 458, *Barbour* v. *State,* 8 Ga. App. 27, the sufficiency of a verdict was passed upon, and it was there said: "A verdict is to be given a reasonable intendment, and, when ambiguous, may be construed in the light of the issues actually submitted to the jury under the charge of the court, and, when so construed, it expresses with reasonable certainty a finding supported by the evidence, it is to be upheld as legal."

In *Willingham* v. *State,* 62 Tex. Cr. 55, [136 S. W. 470], the jury returned a verdict in these words: "We, the jury, find the defendant guilty, and ses his pently at sixty days in jail & $25 fine." The court, in upholding this verdict, said: "It is well settled, where the sense is clear, that neither incorrect orthography nor ungrammatical language will render a verdict illegal or void, and that it is to be reasonably construed and in such manner as to give it the meaning intended to be conveyed by the jury." (Citing a number of authorities.)

In *State* v. *Schweitzer,* 18 Idaho, 609, [111 Pac. 130], the verdict read: "We, the jury in the above-entitled case, find the defendant, George Schweitzer, guilty of selling by short weights, as charged in the complaint." This was held sufficient, as the intent of the jury was clear in that it found the defendant guilty. The words, "selling by short weights," might be treated as surplusage, and still the verdict held good, for then it found the defendant guilty as charged in the complaint. This case distinguishes the general current of authority from the case of *People* v. *Tilley,* 135 Cal. 61, [67 Pac. 42], where it was held that a verdict in these words, "We, the jury in the above-entitled cause, find the defendant, Charles M. Tilley, guilty of receiving stolen property," was insufficient, as it must, in order to constitute a crime, include the knowledge that the property was stolen, and also the intent to deprive the owner of the same. It may be stated, also, that the verdict in the Tilley case did not refer to the indictment or information, which also distinguishes that case from the one at bar, where the indictment is clearly and distinctly referred to.

In *People* v. *McCarty,* 48 Cal. 557, the verdict returned was: "We, the undersigned jurors, find a verdict of murder in the second degree. A. J. Chase, Foreman." This verdict, being recorded, was read to the jury, and each of the

jurors answered that it was his verdict. It was there stated, in upholding this verdict, that, ''while the Penal Code sets forth a form of verdict, it does not bind the jury, and that a mere departure from such form does not of itself vitiate the verdict, if it can be clearly understood as being a general verdict of guilty or not guilty, and that there was no difficulty in understanding the verdict there rendered as being one finding the defendant guilty of murder in the second degree as charged in the indictment.

In *People* v. *Perdue,* 49 Cal. 427, the verdict returned was: ''We, the jury in the case of The People of the State of California vs. Charles Perdue, do find a verdict of manslaughter. By the Foreman, Wm. A. Creps.'' This verdict was held sufficient.

In the case of *People* v. *Holmes,* 118 Cal. 444, [50 Pac. 675], the portion of the verdict pertinent here was: ''We find a verdict of guilty against all the others named in the indictment, to wit: [setting forth the names] and find a verdict of involuntary manslaughter, not a felony, as charged and laid down by the Court under the head of 'Involuntary Manslaughter,' and pray the mercy of the Court in its sentence and punishment, and so say we all.'' The court said: ''The verdict clearly shows an intention to convict, and the grade of the offense is fixed by declaring it to be involuntary manslaughter. . . . But, whatever may have been the intention of the jury, by no possible construction could we reach the conclusion that the jury meant to acquit the defendants, for they not only found them guilty in terms, but recommended them to the extreme mercy of the court in its sentence and punishment. Whether the crime of which the defendants were found guilty was or was not a felony, did not lie with the jury to declare—the statute does this. There is no good reason why the verdict of a jury should not have a reasonable construction, and be given effect according to its manifest intention. The words 'not a felony' should be rejected as surplusage, and the general verdict of 'guilty of involuntary manslaughter' should stand as the verdict.''

Appellant further urges that, admitting the verdict finds the defendant guilty of forging the name of C. O. Cartwright, it is yet silent as to the forging of the name of James Cornell, unless the first clause in the verdict finds the defendant guilty of forging both of the names as charged in the indict-

ment, and that, in such case, as the testimony is insufficient to support a verdict finding the defendant guilty as to James Cornell, a new trial should be granted. This contention is answered in the negative in the case of *People* v. *Leyshon,* 108 Cal. 440, 445, 446, [41 Pac. 480]. There, the defendant was tried on an information charging forgery to a note of the names of Mrs. Maggie Henry and Eliza J. Clark. The defense interposed was that the business relations between the defendant and the two women whose names appeared upon the note were such that defendant either had authority, or supposed he had authority, to sign their names thereto. As to Mrs. Maggie Henry, there was evidence tending to show some foundation for the position assumed by the defendant; but there was a conflict in the evidence on this point, and upon well-recognized principles the verdict cannot, under such circumstances, be set aside for such cause. As to the name of Eliza J. Clark, signed by defendant, we find in the record not one iota of evidence tending to show in the defendant any authority, or ground upon which to found a belief of authority, to use her name upon the promissory note. As to her, the case presented a bald case of forgery, not relieved by any pretext worthy of consideration. The proof that defendant forged the name of Eliza J. Clark to the promissory note described in the information is sufficient alone to uphold the verdict, and for that reason the several rulings of the court upon the admission and rejection of testimony touching the business relations between defendant and Mrs. Maggie Henry need not be considered, for, if erroneous, such rulings do not, under the circumstances, call for a reversal.''

In this case, as heretofore stated, the defendant sets up a like defense. The testimony as to whether the defendant did or did not have authority to sign the name of James Cornell is of such a character that the court would not be warranted in holding it sufficient to support the verdict. But the testimony as to the authority of the defendant to sign the name of C. O. Cartwright, is of such a nature and character as to abundantly warrant the jury in finding the verdict which it returned. A careful reading of the testimony shows that the defendant's claim of authority to sign the name of C. O. Cartwright by reason of their alleged relations is little more than what was called in the Leyshon case ''a mere pretext.'' The whole basis of the claim of the defendant as to his author-

ity to sign the name of Cartwright rested upon the fact that some years previously the defendant had assigned to Cartwright a one-third interest of his one-third interest in certain pending applications for patents in the Crosby tire, which the defendant was exploiting; that C. O. Cartwright had on a previous occasion at a bank in Sacramento signed a note with the defendant. But the testimony shows that the defendant at no other instance ever affixed the name of Cartwright to any paper; that there were no business relations between the defendant and Cartwright as to the patents involved, that Cartwright never participated in any way in the management thereof, or agreed to become a partner or in any way associated with the defendant in his business enterprises, or did anything that a partner would ordinarily be expected to do, and the fact of the defendant's having signed the name of James Cornell and C. O. Cartwright to the note in question was never disclosed by the defendant to either of the persons whose names he had signed, and was only discovered by them a long time afterward when Mrs. Jansen was seeking payment on the note.

The holding in the Leyshon case disposes of the objection urged by appellant that the testimony being sufficient to establish forgery only of one name to the note, the admission of the note in evidence was error. The crime of forgery being established by proof of the forgery of one name, the testimony need go no further, and the note was clearly admissible in evidence.

Finding no substantial reason for reversal herein, the judgment and order of the trial court will be, and the same are hereby, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 19, 1916, and the following opinion then rendered thereon:

PLUMMER, J., *pro tem.*—A re-examination of the record in this cause discloses the fact that counsel for the defendant did enter an exception to the form of the verdict at the time of its return by the jury. This exception does not appear to have been set out in the reporter's notes, and was inserted

in close, typewritten form in the minutes of the clerk, where it was not readily discernible and therefore was not seen. The exception simply went to the form and not to the sufficiency of the verdict, and it nowhere appears that the court was requested to return the verdict to the jury and instruct the jury to further consider the same, as provided by section 1161 of the Penal Code. But, as appears from the opinion of the court hereinbefore rendered, the form and the sufficiency of the verdict returned by the jury in this case have been carefully and fully considered, as having been properly presented for consideration upon motion for new trial in the court below, and as presented to this court on appeal, no injury has resulted to the defendant. However, that no further misapprehension may arise, and in the furtherance of accuracy, the following words, "No question was raised at the time of the return of the verdict as to its form or sufficiency, and it was first presented to the trial court upon the motion for new trial, hence whether the court should or should not have returned the verdict to the jury and directed the jury to reconsider the same as provided in section 1161 of the Penal Code, is not presented for consideration," will be, and the same are hereby, stricken from the opinion heretofore rendered. Every question concerning said verdict which could have been considered if the court had been requested to return the verdict to the jury under said section, having been fully set forth by this court in its consideration of the form and sufficiency of the verdict in its opinion, no reason is presented why a rehearing should be granted to consider the provisions of said section.

The appellant also urgently insists that a rehearing should be granted in order that further consideration may be had of certain instructions not specifically set forth in the court's opinion, and also for the reason that his cause has been prejudiced by the language of the court in reference to his alleged partnership with Dr. C. O. Cartwright.

The defendant was not on trial for embezzlement, and hence instructions 42, 43, and 44, not specifically mentioned in the opinion heretofore rendered, requested by the defendant and refused by the trial court, were properly refused, though correct statements of the law.

Instruction 44, in so far as it had any bearing upon this case, was included in instruction number 45, given at the

request of the defendant, wherein the jury was instructed that evidence of an offense different from that alleged in the indictment could not be considered by them as rendering it more probable or likely that the defendant committed the offense charged, etc. Nor does it appear that the modification of instruction number 23 by the trial court was such as to cause any miscarriage of justice. The jury was instructed that "a general partner is agent for the partnership in the transaction of its business, and has authority to do whatever is necessary to carry on such business in the ordinary manner, and for this purpose may bind his copartner by an instrument in writing." This would necessarily include promissory notes as an instrument in writing. This instruction is followed by one stating that authority to sign one's name to a promissory note might be given by mere word of mouth.

Defendant's instructions 24, 25, 26, and 27 were covered by instructions given by the court.

Instruction 20 was properly refused, as there was no testimony upon which it could be based.

To show that there has been no miscarriage of justice, as contemplated by section 4½ of article VI of the constitution, by reason of any technical errors of the trial court, and also that the defendant has not been prejudiced by this court in applying a quotation from the opinion of the supreme court in the case of *People* v. *Leyshon*, 108 Cal. 440, 445, [41 Pac. 480], to the cause at bar, the defendant's own testimony may properly be set forth.

The seven thousand six hundred dollars misappropriated by the defendant was received by him in the year 1910. In reply to the question (Tr., p. 100), "What did you do with the money, or in what manner, if any, did you loan or invest it for her," he testified: "The money was invested by me in the development and operation of a certain patent resilient spring tire. The money was practically loaned to the Crosbie Resilient Tire Company, which was organized for the purpose of exploiting and developing and placing on the market that tire. I do not recall at the moment when the corporation was organized, but I believe in 1910 or early in 1911. I had absolute charge of the business of the corporation."

As to what took place between the defendant and Dr. Cartwright most clearly appears from the testimony of the defendant in reply to questions by the court (Tr., p. 150 et seq.):

"Prior to November 9, 1911, had you had any conversation on that particular subject as to becoming associated with him? Ans. I think not. I think that the conversations that I had with him prior to that time were along general lines as to the development of the tire and its possibilities. Ques. Well, now, what was that conversation, in substance? Ans. We were speaking of the tire, its possibilities, and speaking of the foreign patents, and I told the doctor of the large amount of money that it was taking to exploit and develop this tire, and how much more it was taking than I ever thought it would take in the first place when I went into it; the patents and all the incidental expenses, and I stated to him, however, that I had the utmost confidence in it, and my confidence was growing as I observed the development of the tire. And he also expressed confidence in the tire; in fact, had always had confidence in it. And then I suggested to him that he become associated with me in business—in the foreign business, not the United States patents or the United States business, but the foreign business. Ques. Well, you say, 'I suggested to him that he become associated.' Did you say: 'Doctor, I would like to have you associated with me in this?' Ans. Probably words to that effect. I won't say just exactly what the words were; but I did tell him that I would like to have him become associated with us in it and reap the benefits with us when there were any benefits to be reaped, and assist us in any way possible in the development if it became necessary. Ques. Well, then, what did he say? Ans. Well, he stated that he would be willing to do so; and I told him that I would then give him an assignment; that I could not give him stock in the foreign patents because there was no foreign corporation covering the foreign patents, but that I would give him an assignment covering my interest in the foreign patents, and that thereafter when the tire had developed sufficiently so that we could commence to market foreign patents or do something with them, and a corporation would be then formed for that purpose; then stock would be issued to him proportionately to the value of the assignments, whatever it might be. Ques. Well, was there another conversation in reference to the subject matter? I am not speaking now in reference to the tire generally, but I mean in reference to his association with you. Ans. Yes; there was some; undoubtedly we held a conversation when I delivered the assignments to

him, but all the conversations were practically along the same lines. If you got one, you practically got them all.''

After testifying that the words ''association and partnership'' were not used in any conversation, that no books were ever opened, that no accounting was ever had, the following testimony appears: (Question by the court.)  ''I am speaking now as to whether or not there was a partnership. I am trying to get at any conversation that may have been had touching any partnership which was actually formed, or which you thought was formed. As I understand, the result of your testimony was that it was only that one time that you remember specifically that you spoke about him being associated with you? Ans. Well, I cannot recall the definite conversations; but I know that many times he did speak about—when it comes to specifying the time of the conversations, I cannot do it, I cannot recall it; I don't remember it, just when they were. Ques. That is the only time that you can recollect, is the one time when the conversation occurred as you say? Ans. Yes; the specific time that I recollect. Ques. And you said something about becoming associated, and he said 'All right?' Ans. Yes. Ques. And he said in effect, 'All right?' Ans. Yes. Ques. And you do not recall any subsequent conversation, or the details of it, in reference to that particular subject matter. I mean about the association part, other than you said a moment ago? Ans. Only specifically in regard to the conversation which followed about the subsequent formation of an actual partnership. Ques. Yes, but that was never consummated? Ans. No, that has not yet been consummated.''

At about the time to which this conversation relates, the defendant delivered to Cartwright an instrument transferring to him for life a one-third interest in the defendant's one-third interest in and to all patents pending and applied for in foreign countries in reference to said tire. The trial was had in September, 1915, and by the defendant's own testimony it appears that the alleged partnership with Dr. Cartwright had not even then been consummated.

The chronological order is as follows: The money was left with the defendant in 1910, to be loaned upon real estate mortgages. The defendant applied it to the uses and purposes of the Crosbie Tire Company, a corporation, of which he was sole manager. In November, 1911, he had a conversation

with Dr. Cartwright about becoming associated with him in foreign patents concerning said tire, which were not being handled by the company. In October, 1913, the note for the forgery of which the defendant was tried and convicted was given to cover the money that had been used by the defendant in the corporation in which he does not testify that Dr. Cartwright had any interest whatsoever. The trial was had September, 1915, at which time, as above stated, partnership relations had not been established.

The testimony of the defendant is quite voluminous, but, as he said to the court, "When you get one conversation, you get it all."

The foregoing, in connection with the opinion heretofore rendered, we think sufficient to show that the defendant's petition for a rehearing herein should be denied, and it is so ordered.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 21, 1916.