[Crim. No. 569. Fourth Dist. Sept. 27, 1945.]

THE PEOPLE, Respondent, v. C. S. McKINNEY et al., Appellants.

Edward L. Davin and E. L. Johnson for Appellants.

Robert W. Kenny, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

GRIFFIN, Acting P. J.—Appellants C. S. McKinney and Michael Marcus and defendant Dale Dodd, were jointly charged in count I with the crime of criminal conspiracy to receive stolen property. It is alleged that they did, between certain specified dates, voluntarily conspire with each other and with one C. R. Holloway, Marvin Kelley, John Dunn, and divers other persons now unknown, for their own gain and to prevent the owner from again possessing said property, to buy and receive property which had been or would be stolen, knowing the same to be stolen. The overt acts charged are (1) that Dunn informed McKinney that he could obtain a quantity of cigarettes for the sum of $1.00 per carton, at

which time defendants knew said cigarettes had been or would be stolen; (2) that subsequently and in pursuance of such conspiracy and to effect its object, defendants agreed to receive from Holloway a quantity of cigarettes to be delivered at a future date for $1.00 per carton, knowing that said cigarettes had been or would be stolen; (3) that thereafter defendants agreed to give Holloway $50 for the delivery of the stolen cigarettes; (4) that defendants met with Holloway, Kelley and Dunn for the purpose of arranging for the sale of said stolen cigarettes to defendants; (5) that again defendants met with Holloway, Kelley and Dunn for the same purpose; (6) that defendants later met with Dunn and agreed that the cigarettes would be delivered to defendants' place of business, namely, the Club Biltmore, on the early morning of January 16, 1945, knowing at the time that said cigarettes had been or would be stolen; (7) that on January 16th defendants, in pursuance of such conspiracy, received from Kelley and Dunn, 11 bales of cigarettes, knowing the same to have been stolen, which were in fact stolen from the Post Exchange, Camp Pinedale, in Fresno County; (8) that defendants then paid Dunn $500 therefor; (9) that thereafter defendants concealed and withheld such stolen property from the owner.

The second count of the information charges each appellant, McKinney and Marcus, with the crime of "receiving stolen property" in that they did, for their own gain and to prevent the owner thereof from again possessing said property, on January 16, 1945, receive 11 bales of cigarettes belonging to the Post Exchange, then and there knowing the same to have been stolen. After a plea of not guilty was entered a trial was had by jury which returned separate verdicts of guilty as to appellant McKinney on the charges of conspiracy to receive stolen property and of receiving stolen property. A separate verdict of not guilty was returned on the conspiracy count but guilty on the receiving stolen property count as to appellant Marcus.

During the course of the trial, on motion of his counsel, the case was dismissed as to defendant Dale Dodd.

Appellant McKinney was the manager of, and appellant Marcus and defendant Dale Dodd were employees in a night club known as Club Biltmore, in Fresno. Kelley and Dunn were privates in the Army and were stationed at Camp Pinedale near that same city. Holloway was stationed at the Fair Grounds.

On the night of January 5, 1945, Dunn and Kelley met Holloway near the club. They told Holloway that they had about 1,000 cartons of cigarettes that they would like to sell if he knew where he could sell them at $1.00 per carton. Holloway replied that he would try to find a purchaser. On January 7th Holloway met defendant Dale Dodd and informed him about the cigarettes. During a later conversation, Dale Dodd told Holloway that he thought his brother Joe Dodd would like to take about 500 of the cartons. About January 10th Holloway had a conversation with appellant McKinney at the club and told him about Dunn and Kelley and offered to get 500 cartons at $1.00 per carton for him. McKinney said: "Bring them around." On January 10th Kelley was introduced to McKinney for the first time by Holloway. They conversed about the deal and Kelley told McKinney that Dunn was at some gunnery class, would be back on Sunday night, and that soon thereafter the cigarettes would be delivered. Again, on January 12th, Holloway and McKinney conversed at the club. Holloway told McKinney that this deal was strictly nonprofit, as far as he was concerned, and McKinney told him that he would give him $50 if it went through.

Joe Dodd, brother of Dale Dodd, owned a lunch stand in Fresno. Holloway testified that he first approached Joe Dodd about January 12th, at the Club Biltmore; that he told him he knew where cigarettes were available and asked him if he wanted to buy some; that he answered in the affirmative and that he told Joe Dodd he would arrange a meeting between him and the persons who had them. Subsequently, Holloway told John Dunn of the conversation with Joe Dodd and that Joe could be located at his cafe. Dunn later visited Joe Dodd at his place of business. On January 14th Dunn, Kelley, Holloway and McKinney met, in a booth, at the Club Biltmore. Dunn told McKinney that the cigarettes would be delivered some time during the early morning of January 16th; that there would be 500 cartons at $1.00 apiece. McKinney agreed and informed them that they need not worry about the cigarettes being found at the club as he wouldn't keep them there.

On January 15th the Camp Pinedale Army Post Exchange had on hand about 30,000 packages of cigarettes. The bales or boxes in which the cartons were contained were plainly labeled: "Post Exchange, Camp Pinedale, California," in type about 1½ inches in height. There were no identifying

marks on the packages of cigarettes or cartons to distinguish them from those purchased on the open market. During the early morning hours of January 16th, Dunn and Kelley stole an army truck from the camp and drove to the Post Exchange, broke open the rear door, stole and removed 26 full bales and some broken bales of cigarettes, which bales contained about 50 cartons each. The truck, driven by Dunn, crashed the west gate of the camp. Kelley was just outside in a stolen Chevrolet. They drove to a vacant lot in Fresno. Ten bales of cigarettes were transferred from the truck to the Chevrolet. Dunn and Kelley drove the Chevrolet directly to the Club Biltmore and arrived at about 2:45 a. m. Five minutes thereafter appellants McKinney and Marcus drove up. They all retired to an apartment back of the club. There Dunn informed McKinney that the cigarettes were in the Chevrolet. McKinney stated that the transfer would be made away from the club. About 3:20 a. m. Dunn asked if he could use the phone in the apartment to get in touch with Joe Dodd. Dunn placed the call but McKinney took the phone and told Dodd that the boys were out there with the cigarettes and for him to come and get them or make some arrangements to have them delivered. Joe Dodd testified that he did not know he was talking to McKinney but believed it to be the soldier who had previously made arrangements with him about the sale of the cigarettes. Kelley and McKinney stayed at the apartment. Marcus and Dunn left and remained away about 20 minutes. Kelley heard their car drive away. After Marcus and Dunn returned Kelley noticed the cigarettes had been removed from the Chevrolet. Later, Kelley drove the Chevrolet back to the army truck and loaded 12 more cases of cigarettes into the Chevrolet. When he returned, Dunn, McKinney, Marcus and Joe Dodd were present.

Joe Dodd testified that he received a phone call at his home in the early morning of January 16th telling him to pick up the cigarettes at the Club Biltmore; that he had made no arrangements for the delivery of the cigarettes at that club; that prior thereto he did not know that Marcus or McKinney would be there or that any cigarettes were being delivered to them; that he had never discussed the purchase of cigarettes with Marcus or McKinney; that he then learned for the first time that cigarettes were being delivered to them; that he did not know, when he bought the cigarettes, that they were stolen and no one told him that they were; that Dunn told him they

were not stolen and had he known they were so stolen he would not have taken them; that he did not look at them to observe the "Camp Pinedale" on the sides of the bales; that Kelley brought one bale of cigarettes into the apartment and Marcus checked to see if the bale was full; that Kelley then drove the Chevrolet and Joe Dodd drove his own car about 200 feet from the club where 11 bales of cigarettes were transferred by Kelley to Joe Dodd's car; that Kelley then returned to the apartment; that a 12th bale of cigarettes had been turned over to McKinney prior to the delivery to Dodd. On their return to the club, when all the parties mentioned were present, McKinney asked Dunn if Marcus had given him the $500. Dunn said he had been given that amount. Joe Dodd saw Marcus pay that sum to Dunn when Kelley was present. A short time after the cigarettes were delivered to Dodd and McKinney, Dunn and Kelley left. Later, Dunn gave $200 to Holloway, $400 to Kelley, and retained the balance which appeared to be about $400.

An officer at Camp Pinedale testified as to the burglary and the number of bales of cigarettes missing; that they were marked "Camp Pinedale Exchange"; that the bale of cigarettes in evidence (recovered from Joe Dodd, marked as indicated) "contained cigarettes of the size and nature that we have had out at the Post Exchange." No carton or package of that description was found on the Club Biltmore premises or in the possession of the appellants when search was made at a later date.

During the course of the trial Joe Dodd testified that he had the promise of the district attorney that if he would testify in this case he would not be prosecuted; that he received only 11 bales from the army boys and disposed of most of them and that he delivered the remaining bale to the district attorney.

Holloway and Kelley testified for the prosecution. Appellant Michael Marcus failed to testify at the trial. Appellant McKinney was a witness in his own behalf and testified that he met Holloway at the Club Biltmore; that he was a friend of Dale Dodd; that about January 1st he (McKinney) bought 18 small packages of cigarettes from Holloway; that Holloway had apparently purchased these at the exchange; that Holloway asked him if he would like some more later on; that he stated he would; that Holloway introduced Kelley to him about January 12th and stated that Kelley might also bring him some cigarettes; that Kelley agreed to this; that on January 15th

Kelley, Holloway and Dunn talked to him in a booth at the club and they asked him if he "was interested in buying the cigarettes"; that he told them he was; that nothing was said about the price or amount; that after the close of the club on the night of the 15th he and Marcus checked the sales and cash; that they completed this task about 2 a. m. and drove to a nearby place to get something to eat; that they retired to the rear of the club into the apartment in which he lived and saw the Chevrolet with Dunn and Kelley sitting in it; that Dunn asked him if he had seen Joe Dodd and also asked if he would be interested in some cigarettes; that he asked how many he had and that he said 25 or 30 cases; that he told him he would not be interested in that amount; that Dunn called Joe Dodd and told him that he was at the Club Biltmore and that he had his cigarettes for him and wanted to know where he would like them delivered; that he talked to Joe Dodd and Dodd asked him to receive and pay for them for him; that he told him he wanted nothing to do with those cigarettes and if he wanted them he could come out and get them; that Joe said he would be right out; that Marcus, Dunn, Kelley and Joe Dodd were later present in his apartment; that Dunn told Joe Dodd that Kelley would go with him to make the transfer of the cigarettes into his car; that they left for about 15 minutes; that Kelley brought a bale of cigarettes into his apartment and said: "This is for your trouble" and that he told him he didn't want any part of it; that Kelley then took it away; that there was no other conversation about the cigarettes and that no money passed in his presence; that he received no cigarettes and paid no money to anyone. He denied having any other conversation with any of the parties mentioned. On cross-examination he admitted having been previously convicted of a felony on two counts of burglary.

Holloway testified that he at no time knew the cigarettes were to be stolen or that they had been stolen. Kelley testified that he and Dunn had burglarized at least five places in Fresno between December 5th and January 16th.

It is argued on this appeal that Joe Dodd was an accomplice or coconspirator, as a matter of law, and that therefore there was no substantial corroboration of the testimony of the accomplices to show appellants' connection with the crime or crimes of which they were convicted. The testimony of Holloway and Kelley, if believed by the jury, clearly shows the commission of the offenses charged. The testimony of ap-

pellant McKinney corroborates their testimony to a great extent. Added to this is the testimony of Joe Dodd. It cannot be said, from the evidence, as a matter of law, that Joe Dodd was a coconspirator, or an accomplice to the overt acts related in the information and the crimes charged against these particular appellants. The most that could be said is that the question was one of fact for the jury to determine under proper instructions. (*People* v. *Ross*, 46 Cal.App.2d 385, 394 [116 P.2d 81]; *People* v. *Compton*, 123 Cal. 403 [56 P. 44]; *People* v. *Williams*, 30 Cal.App.2d 234 [85 P.2d 974].) The jury was repeatedly instructed in the language of section 1111 of the Penal Code as to who may be an accomplice and that the testimony of an accomplice must be corroborated; that it was "necessary that the prosecution prove, by evidence outside of and in addition to, that of the co-conspirators, that the agreement or conspiracy did in fact exist and that the defendants were connected therewith as conspirators. It is not necessary that all of the facts and circumstances of the conspiracy be shown by such independent evidence, but only that the agreement existed and that these defendants were a part of such conspiracy as participants." No complaint is made as to the court's instructions given on the subject. They were full and complete. The jury believed that there was sufficient corroboration of the accomplice's testimony. This implied finding cannot be disturbed on appeal.

As to the charge of "receiving stolen property" set forth in the second count of the information, it cannot be held that the thief, or coconspirator to receive stolen property, must be, as a matter of law, regarded as an accomplice of the one receiving the stolen goods. (*In re Morton*, 179 Cal. 510 [177 P. 453]; *People* v. *Clapp*, 24 Cal.2d 835 [151 P.2d 237]; *People* v. *Stoddard*, 48 Cal.App.2d 86 [119 P.2d 160]; *People* v. *Burness*, 53 Cal.App.2d 214 [127 P.2d 623].) Notwithstanding this contention, there is substantial independent corroborating evidence supporting the claimed accomplice's testimony to uphold the convictions on this count.

It is next argued, in the opening brief of appellants, that the acquittal of Marcus of the conspiracy charge was indirectly an acquittal of that defendant of the crime of receiving stolen property. In their reply brief they concede that the holding in *People* v. *MacMullen*, 218 Cal. 655 [24 P.2d 793], destroys this argument.

The next error complained of, which is of a more

serious nature, results from an unhappy wording of the separate verdicts returned against the appellants. These separate verdicts, as to each defendant, read as follows: "We, the jury in the above-entitled action, find the defendant . . . guilty of receiving stolen property." "We, the jury . . . find the defendant C. S. McKinney guilty of conspiracy to receive stolen property." It will be noted that neither verdict recites: "as charged in the first count of the information," or "the second count." Appellants contend that this omission is fatal and reversible error resulted. A similar form of verdict as to "receiving stolen property" was returned in the case of *People* v. *Tilley* (1901), 135 Cal. 61 [67 P. 42], cited by appellants, in which case the judgment of conviction was reversed and the defendant ordered discharged for reasons therein set forth. In addition thereto appellants cite *People* v. *Small*, 1 Cal.App. 320, 322 [82 P. 87]; *People* v. *Bowman*, 24 Cal.App. 781, 787 [142 P. 495]; *People* v. *Cornell*, 29 Cal.App. 430, 443 [155 P. 1026]; *People* v. *DeVaughn*, 136 Cal.App. 746, 749 [29 P.2d 914]; *People* v. *Murray*, 42 Cal. App.2d 209, 215 [108 P.2d 748].

It is argued that, as to the second count, the verdicts lack the essential elements of the offense charged, to wit, that the property was received for their own gain, and knowledge that they knew the property was stolen; that as to the first count relating to the conspiracy charge, the verdict lacked the essential elements of knowledge, personal gain to defendants, as well as intent to prevent the owner from possessing said property. We must concede that the prosecution did not follow the form of verdict prescribed in section 1151 of the Penal Code. Proper pleading would require that the verdict make adequate reference to the information and counts specified therein under which the issues were presented by the plea of not guilty. The rule generally applied in cases where one offense is charged, and where a general verdict is rendered, is that the verdict of guilty imports a conviction of the offense charged in the information and upon every material allegation therein contained. (*People* v. *March*, 6 Cal. 543; Pen. Code, § 1151.) The verdicts in the instant case were general verdicts (*People* v. *McCarty*, 48 Cal. 557; Pen. Code, §1151.) There are innumerable authorities which declare that the form of the verdict is immaterial if the intention to convict of the crime charged is unmistakably expressed: (*People* v. *Mercado*, 59 Cal.App. 69, 74 [209 P. 1035]; *People* v. *West*,

73 Cal. 345 [14 P. 848] ; *People* v. *Adams,* 92 Cal.App. 6 [267 P. 906].) Penal Code, section 1404 provides that "Neither a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right." (See, also, Pen. Code, §§ 960 and 1258.)

The form of verdict should be construed in connection with the information and the plea of the defendant. (*People* v. *Mercado, supra.*)

The charging portion of the information in this case reads: "Count I. The District Attorney . . . accuses (defendants) . . . of a felony, to wit: CRIMINAL CONSPIRACY TO RECEIVE STOLEN PROPERTY IN that the . . . defendants . . . conspired . . . etc." Then follows the enumeration of the alleged overt acts. "Count II. Complainant further accuses said defendants . . . of the crime of a felony, to wit: RECEIVING STOLEN PROPERTY, committed as follows: . . ." Then follows the specified charge in the general language of section 496 of the Penal Code. In conjunction therewith it should be noted that by stipulation the jury took with it to the jury room a copy of the information setting forth in full the charges above related. The trial court thoroughly instructed the jury on the necessary elements essential to prove before a conviction could be had on each count. When presenting the verdicts to the jury the trial judge then instructed the jury in the following language:

"Now, those instructions are rather long and for that purpose I desire to review a little of it in order to clarify in your minds the difference between the two offenses which are charged in the information and with respect to which it is your duty to pass on the facts.

"The defendants in this case are charged with two different crimes. First, the crime of conspiracy to receive stolen property. Second, the crime of receiving stolen property. The evidence necessary to convict is different in the two crimes . . . the soldiers who committed the burglary and theft of the cigarettes are not accomplices on the crime of receiving stolen property. Therefore, if you believe their testimony, and if it establishes the necessary elements of the crime, and convinces you thereof beyond a reasonable doubt, then their testimony would be sufficient standing alone, to justify your verdict of guilty against the defendants on the charge of *Count II* of

the complaint, that is receiving stolen property.'' (Italics ours.)

When the jurors returned into court with the verdicts, they were individually polled as to each verdict. No objection was then taken by appellants as to the form thereof, as suggested in *People* v. *Gayle*, 202 Cal. 159, 163 [259 P. 750] ; Pen. Code, § 1161; *People* v. *Cornell*, 29 Cal.App. 430 [155 P. 1026]), and no objection was made thereto on the motion for new trial. The question here presented was raised for the first time on this appeal.

In *Johnson* v. *Visher*, 96 Cal. 310 [31 P. 106], it is said at page 314:

''As a general rule, a party will not be heard to object to a verdict for the first time on appeal from the judgment, if it is susceptible of a construction which may have a lawful and relevant effect,'' relevant to the pleadings.

This was approved in *People* v. *Morley*, 8 Cal.App. 372, 376 [97 P. 84]. In *Barbour* v. *State*, 8 Ga.App. 27 [68 S.E. 458], it is said:

''A verdict is to be given reasonable intendment, and, when ambiguous, may be construed in the light of the issues actually submitted to the jury under the charge of the court; and if, when so construed, it expresses with reasonable certainty a finding supported by the evidence, it is to be upheld as legal.'' See, also, *People* v. *West*, 73 Cal. 345, wherein the court said, at page 346 [14 P. 848] :

''Section 1151 of the Penal Code provides that a verdict of guilty upon the general issue imports a conviction of the crime charged in the information. Under the instructions given by the court, the jury could not have been misled, and the verdict is sufficient in form and substance.''

Under the facts related, it seems clear to us that the jurors were fully instructed as to the nature of the charges against the defendants and that the intention of the jury to convict the defendants of the offenses charged in the information is unmistakably expressed and sufficient in form and substance to apprise them of its conclusions as to the issues presented. It is true that most of the cases cited by appellants and those cited by respondent in support of the form of verdict distinguishes the form of verdicts in the cited cases from the one in the Tilley case by reason of the fact that the verdicts rendered in the cited cases refer specifically to the charge in the information or specified counts set forth therein. We are

aware of the general rule stated in 8 California Jurisprudence, page 404, section 434, that ''Where the statute in a word specifies and defines the crime, it is sufficient for the verdict so to specify it. Thus, it is sufficient for the verdict to find the defendant guilty of 'forgery' or of 'manslaughter'. But when the statute does not define the crime except as the specially forbidden acts define it, a verdict is insufficient which neither refers to the information nor contains a recital of the inhibited acts.'' (*People* v. *Tilley, supra; People* v. *Somsky,* 46 Cal. App. 377 [189 P. 456].)

In this connection it should be noted that section 182 of the Penal Code specifically defines the offense of criminal conspiracy. Section 496 of the Penal Code defines what acts constitute the offense and defines the offense under the subhead: ''Buying or receiving stolen property.''

By inference, the language of *People* v. *Chavez,* 11 Cal.App. 2d 388 [53 P.2d 1020] (hearing denied by Supreme Court) leads one to believe that *People* v. *Tilley, supra,* is affected by article VI, section 4½, of the Constitution. In that case the court upheld a verdict of conviction of ''burglary in the first degree'' and made reference to the Tilley case in the following language, at page 390:

''Appellant lays stress upon *People* v. *Tilley,* 135 Cal. 61 [67 P. 42] and other cases which preceded section 4½ of article VI of the Constitution. These cases which followed the rule of strict interpretation, and which were reversed on a meager showing of error, were decided upon an appeal from the judgment. None supports the argument of appellant that the verdict here in question was void upon its face.''

*People* v. *Tilley, supra,* has been questioned on another ground. In *People* v. *Tong,* 155 Cal. 579, 580 [102 P. 263, 132 Am.St.Rep. 110, 24 L.R.A.N.S. 481], it is said: ''If it be the doctrine of the case of . . . *People* v. *Tilley* . . . that the defendant has been once in jeopardy in every case wherein a verdict of guilty of a crime not strictly embraced within the pleadings has been returned and the jury has been discharged without consent, then those cases should be overruled.'' (See, also, *People* v. *Sachau,* 78 Cal.App. 702, 704 [248 P. 960].)

In *People* v. *Cecil,* 72 Cal.App. 565 [237 P. 568], the jury returned a verdict on a charge of ''violation of the provisions of section 288 of the Penal Code'' and omitted the words ''as charged in the information.'' In affirming the judgment the court said, at page 569:

''We are not prepared to follow the state to the extent that the verdict as rendered is free from legal objections. It has been pointed out in numerous cases that in the trial of cases of this nature the verdict should find the defendant guilty or not guilty of the offense 'charged in the information or indictment.' Though we entertain these views it does not follow that the judgment should be reversed. At the time of the oral argument we requested the appellant to point out to us what prejudice resulted to him from the form of the verdict, but he was unable to do so. We have examined the entire record with care and are satisfied from our examination that the appellant was fairly tried and fairly convicted of the offense charged in the information, and we are unable to perceive how any prejudice has resulted to him because the jury in rendering its verdict failed to include in its verdict the words 'as charged in the information.'

''Without approving the form of the verdict, but because no prejudice is shown to have resulted therefrom, the judgment and order denying a new trial are affirmed.'' (See, also, *People* v. *Eley*, 121 Cal.App. 53 [8 P.2d 885].)

We are opposed to the contention that the verdicts as rendered in the instant case are void on their face and that defendants have been once in jeopardy. We prefer to follow the more liberal construction and give effect to the plain intention of the jury as expressed by their verdict rather than the technical construction applied in *People* v. *Tilley, supra*. We are firmly convinced that the defendants were not prejudiced by the claimed error or omissions in the form of verdicts. Considering the evidence, the pleadings, instructions, verdicts and the merits of the case, no miscarriage of justice resulted.

Judgment and order affirmed.

Marks, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 25, 1945. Carter, J., and Schauer, J., voted for a hearing.