### Smith v. Commonwealth.

(Decided January 20, 1925.)

## Appeal from Laurel Circuit Court.

1. Indictment and Information—Separate Paragraphs should be Numbered.—Separate paragraphs of indictment should be numbered.
2. Criminal Law—Failure to Number Separate Paragraphs of Indictment Held Not Prejudicial to Defendant's Substantial Rights.—Failure to number separate paragraphs of indictment held not prejudicial to any substantial right of defendant.
3. Indictment and Information—Allegation Held Sufficient to Charge that Acts were Done in County.—Allegation, in third paragraph of indictment, that acts were done "then and there," without specifying the county, held sufficient allegation that acts were done in county specified in preceding paragraphs.

4.  Criminal Law—Statute as to Incompetency of "Confession" Not Applicable to Written Statements of Witness Not on Trial.—Kentucky Statutes, sections 1649b-1, 1649b-3, prohibiting admission of evidence of "confession obtained by means of sweating," held inapplicable to written statements made by a witness who had been arrested, but was not being tried with defendant; such evidence not constituting "confession."

5.  Witnesses—Testimony of Witnesses May be Contradicted by Proof of Written Statement Previously Made.—Court properly allowed witness to be contradicted by proof of written statement made while under arrest.

6.  Witnesses—Refusal to Allow Witness, Contradicted by Written Statements Made by Her while Under Arrest, to Explain Circumstances Under which She Made Statement, Held Error.—Where testimony of witness was contradicted by written statements made while under arrest, refusal to allow witness to state circumstances under which statements were made, and inducements held out to her, held error.

7.  Criminal Law—Credibility of Witness and Weight of Contradictory Statements Held for Jury.—Credibility of witness and weight to be given written statements made by her while under arrest, introduced to contradict witness, were questions for jury.

8.  Criminal Law—Exclusion of Testimony as to Purpose of Parties to Alleged Conspiracy in Visiting Defendant a Few Days Before Homicide Held Error.—In homicide prosecution, in which state had shown that parties to alleged conspiracy with defendant had visited defendant a few days before the homicide, refusal to permit defendant to show their purpose in making the trip held error.

9.  Homicide—Evidence as to Defendant's Condition on Arrival at House Four Miles from Place of Homicide Held Inadmissible.—Evidence as to defendant's condition on arrival at witness' house four miles from place of homicide held inadmissible, in view of time that had elapsed since commission of crime and opportunity given defendant for preparation.

10. Homicide—Testimony of Merchant as to Condition of Buyer of Cartridges Held Admissible on Question as to Whether She Bought them Before of After the Shooting.—In homicide prosecution involving self-defense, evidence as to condition of woman, who had accompanied deceased to place of homicide, when she purchased cartridges the night of the shooting, held admissible on question of whether she purchased· cartridges before or after the shooting.

11. Homicide—Evidence that Deceased Had Engagement to go to Place Other than that of Homicide During Night of Homicide Held Admissible.—Where it was alleged that defendant had shot deceased pursuant to a conspiracy, evidence as to defendant's engagement to go elsewhere than place of homicide during the night of the homicide held admissible as evidence as to part of the day's doings, especially in so far as it tended to show that

defendant could have had no reason to expect deceased's presence at place of homicide during such night.

12. Witnesses—Cross-Examination of Witnesses as to Good Character for Peace and Quiet of Defendant Charged with Homicide Held Improper.—Cross-examination of witnesses, who had testified that defendant charged with homicide was a man of good character for peace and quiet, as to whether they had not heard that defendant had committed immoral deeds and illegally sold whiskey, held improper, although witnesses said they had not heard thereof.

13. Homicide—Evidence Held Not to Warrant Instructions on Conspiracy.—In homicide prosecution, evidence held not to warrant instructions on conspiracy to kill deceased.

14. Homicide—Defendant Not Deprived or Right of Self-Defense by Existence of Conspiracy, where Not Present for Purpose of Carrying out Conspiracy.—Though conspiracy may exist, the defendant is not deprived of the right of self-defense, unless he is present for the purpose of carrying out the conspiracy.

15. Homicide—Court should Charge Whether Deceased was Making Unlawful Arrest at Time of Homicide.—In prosecution for homicide, court should charge that, although deceased was peace officer, he was without authority to make arrest without warrant, when offense was not committed in his presence.

J. G. ROLLINS and LEWIS & LEWIS for appellant.

FRANK E. DAUGHERTY, Attorney General, and CHAS. F. CREAL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

The grand jury in Knox county returned an indictment against Hamp Hubbard, Gus Smith, Otie Warren, John Bailey, Pete Bailey and Charley Gray charging them in the first paragraph with the wilful murder of Charley West by shooting him with a gun. In the second paragraph it was charged that Gus Smith did the shooting and each of the other defendants was present aiding and abetting. In the third paragraph of the indictment it was charged that all of the defendants entered into a conspiracy to kill and murder him and murdered him pursuant to the conspiracy. Gus Smith was placed on trial; he pleaded not guilty. He was found guilty of voluntary manslaughter and his punishment fixed at twelve years' imprisonment. He appeals.

The demurrer to the indictment and each paragraph of it was properly overruled. The separate paragraphs

should have been numbered, but the fact that they were not numbered prejudiced no substantial right of the defendant. The allegation in the third paragraph that the acts were done then and there is a sufficient allegation that the acts were done in Knox county as had been alleged in the preceding paragraphs, for the words "then and there" can have no other application.

The proof on the trial was very conflicting. The proof for the Commonwealth showed in brief these facts: Charley West was the jailer of Knox county. Steve Smith, a prisoner in the jail, had escaped and on November 23, 1923, Charley West obtained a warrant of arrest for Steve Smith charging him with breaking jail and with this warrant left Barbourville about nightfall in his car, having sent a horse ahead of him. He went in the car about eight miles; there he left his car and got upon his horse. He rode the horse from there to the house of Jim Messer on Lost creek, about 25 miles from Barbourville. While he was there shots were heard up the creek. He then determined to go up and investigate this shooting. He summoned Jim Messer's three sons, Allan, A. Y., Jr., and Foster, to go with him and assist him. Their sister, Tressa Messer, also went along with them. She lived up the creek beyond the house of John Bailey. They passed the house of Pete Bailey, who lived about 400 yards from Jim Messer, and came to the house of John Bailey, which was about 400 yards farther on. West thought that the shooting had been done near there. A big gate stood at the road. There was a paling fence around the house and a yard gate a short distance from the big gate. They entered the big gate and came up near the paling fence. West hollered "Hello." Mrs. John Bailey came out on the end of the porch and asked him what he would have. He said: "This is Charlie West, jailer of Knox county, and I came up here to see what that shooting was about." He came on up farther inside the yard and asked her what that shooting meant. She said there was no shooting; he said he knew there was for he heard it with his own ears. He said, "Who is here?" She said, "No one but Gus Smith." He said, "Tell him to come out, I want to know what that shooting means." She ordered him out of the premises. She said, "You want trouble." He said, "No, sir; I am Charlie West, jailer of Knox county, and I am a peace officer and working around here." He walked around her; she ordered him out again and he said, "I want to know what

the shooting was about up here." At this juncture Otie Warren, who was Mrs. Bailey's daughter and had come out on the porch, said, "Run here, Gus, and shoot them," and he opened the door with a shot gun in his hand, killed Charley West and shot Allan Messer through the leg, inflicting a painful but not a mortal wound. A. Y. Messer and Allan Messer state that they saw John Bailey and Peter Bailey in the door or near it when Smith was shooting and that shots were fired at them from the corner of the house.

On the other hand, the proof for the defendants is in brief this: On the previous Sunday evening the Messer boys had been up at John Bailey's armed with pistols, which they fired off a number of times, threatening to do injury to Pete Bailey, who was there in his father's yard drunk. John Bailey and his wife frequently requested them to leave and to behave, but they refused to go until they had much alarmed the family. On the following Thursday Hamp Hubbard, Charles Gray and Gus Smith, who live in Bell county, about six miles away from John Bailey's, came to John Bailey's about nightfall with seven dogs to go hunting. After they had supper Hubbard, Gray and John Bailey went hunting. Gus Smith declined to go as it was drizzling rain and lent his gum coat to John Bailey, who was his father-in-law. A while after supper he went to bed and went to sleep. The only other people left in the house were Mrs. Bailey, Ottie Warren and her two small children. They all went to sleep. A shot down the lane toward Pete Bailey's waked up Mrs. Bailey. She then heard some talk coming up the branch and heard the big gate fall at the mouth of her lane. She then heard a call for Hamp Hubbard and Gus Smith. She then waked Otie Warren and they went to the door in their nightclothes and barefooted. She asked what he would have; he asked where Hamp Hubbard was; she said that he was not there; he asked where he went; she said that he went hunting; he asked, "What in the hell did you say," and she told him again. She did not know who she was talking to. She then walked down the lower end of the porch and got down on the ground. Her shepherd dog that was under the porch came out and got between her and the man. She made the dog go back and got out on the ground between the porch and the pavement. When she got out there he asked, "Where was

that shooting going on up there," and she said, "I did not hear any shooting up there." He said he came up there to see where the shooting was at and asked her what was they over in Knox county mixing in his business for. She said that they was not over there mixing in anyone's business that she knew of. He asked then what they were down on Lost creek hunting for the Messer boys for, and she said that they were not down there hunting for the Messer boys. He then said to her, "Well, I just come up here to show them what a God-damn bad man was" or "who was a God-damn bad man." She then asked him what they were banding up and coming in there on her for at that time of night; that she was getting tired of being bothered; that she was bothered on Sunday night by a big crowd of them. By this time she recognized the Messer boys but did not know West. The Messer boys had pistols in their hands. He then asked her where Gus Smith was; she said that he was in the house in bed; he said for to go wake him and she said that she would not do it, and he said he would go in and wake him up in hell, and he kept pressing in the yard and came in between her and the house and walked up to the window of the lower room of the house and they began shooting in the window. They continued to fire a great number of shots. Smith was sleeping in this room. The glass from the window fell over him in the bed. He was waked up by the shots and rolled out of bed on the floor, thinking that was the safest place for him. Lying on the floor he pulled his pants on and also his shoes, then crawled to the corner of the room where the shot gun was and with the shot gun went to the front door, which was standing open. When he appeared in the door two shots were fired at him, both of which grazed him but did not seriously wound him. He returned the shots with the shot gun, aiming at the flash of the pistols and these shots struck West and Allan Messer. He testifies that after shooting the shot gun and while he was standing still in the door another shot was fired at him by some one nearer the fence and that he drew his pistol and shot at this flash of the pistol. This shot killed Foster Messer. Smith testifies that then he went back through the rear of the house and went to the house of a man by the name of Napier, four miles away. Mrs. Bailey and her daughter went back in the house, waked up the child that was asleep and went out under a cliff

back of the house and spent the night there. John Bailey, Hamp Hubbard and Charley Gray testify that they hunted possums until about half-past ten or eleven o'clock, killed three, and a shower coming up about that time, they went under a cliff and knew nothing about the trouble at John Bailey's house until they met Pete Bailey about two o'clock in the morning as they were returning to the house. Pete Bailey testifies that he was at home asleep and was waked up by the shooting and knew nothing of what occurred there; that hearing the shooting he went up there the back way and found his mother and sister out under the cliff and then went to look for his father.

Otie Warren was arrested with the other defendants and placed in jail. While she was thus in custody the jailer took her one day to his room in the jail building. The Commonwealth's attorney and a stenographer were there. The Commonwealth's attorney asked her a great many questions covering the whole scope of the case. Her answers were taken down by the stenographer. On a subsequent day this paper was read to her by the county judge and she swore to it. On the trial she was sworn as a witness for the Commonwealth and testified, but her answers were not as her answers on the previous examination by the Commonwealth's attorney. On cross-examination by the defendant's attorney she stated the facts practically as they were stated by her mother and Gus Smith. The Commonwealth's attorney then produced the stenographic report of her first examination and asked her if she had made the answers therein, which were inconsistent with her testimony on the trial. She said she had not. The defendant's attorney objected to these answers being read to the jury, and his objection being overruled, excepted. He then offered to prove by her how she came to be in that room; what inducement had been given her to make these statements and the circumstances under which they were made. The court refused to admit this testimony, holding that it was immaterial as she had denied making these statements. It was then proved by the stenographer and the county judge that she had made the statements and the court allowed them read to the jury, telling the jury that they were only competent evidence to contradict the witness and should not be considered as substantive evidence against the defendant Smith. The defendant complains that the whole of her examination as taken down

by the stenographer was allowed to be read, but there was no objection to this on the trial and the court allowed the whole paper to be read, evidently thinking from what had been said that the defendant wished it all read if any part of it was read.

The defendant insists that the whole of the paper was incompetent under the anti-sweating act, which so far as is material is in these words:

"That what is commonly known as 'sweating' is hereby defined to be questioning of a person in custody charged with crime in an attempt to obtain information from him concerning his connection with crime or knowledge thereof, after he has been arrested and in custody, as stated, by plying him with questions or by threats or other wrongful means, extorting from him information to be used against him as testimony upon his trial for such alleged crime.

"That no confession obtained by means of sweating, as defined herein, shall be permitted as evidence in any court of law in this state, but shall be deemed to have been obtained by duress, if it be shown that such confession was made after the arrest of the party charged with crime, and while he was in custody of the law." Kentucky Statutes, 1649b-1, 1649b-3.

It will be observed that what the statute condemns is the "extorting from him information to be used against him as testimony upon his trial for such alleged crime." The information obtained by the Commonwealth's attorney was not used against Otie Warren upon her trial for the alleged crime. It was used only to contradict her testimony as a witness upon the trial of Gus Smith. The purpose of the statute is the protection of the defendant on his trial from statements made by him under such circumstances, but the language of the statute excludes the idea of the protection of a witness from contradiction. This is shown by the words "no confession obtained by means of sweating as defined herein shall be permitted as evidence." The word "confession" excludes the idea that evidence so obtained may not be used to contradict a witness, for such evidence is in no sense a confession.

We therefore conclude that the court properly allowed the witness to be contradicted by proof of the statements she had previously made, but he erred in refusing to allow her to explain what inducements were held out to her to make these statements and under what circumstances they were made; for the evidence only went to the credibility of the witness and the weight to be given the contradictory statements was for the jury under all the circumstances.

The Commonwealth introduced some testimony showing that Mrs. Pete Bailey and Otie Warren rode horseback over to Gus Smith's a few days before the homicide. The defendant offered to show by them for what purpose they made this trip. This testimony should have been allowed, because the purpose of the trip was what made it important or unimportant in the case. Smith offered to prove by Bob Napier his condition when he got to his house. The court refused to allow this proof, and in view of the length of time that had elapsed and the opportunity this gave for preparation the ruling was proper. Tressa Messer bought some 38 cartridges of a merchant that night, the merchant living a mile or two away. The Commonwealth proved that Tressa bought these cartridges after the shooting. The defendants undertook to prove that she bought them before the shooting and that these were the cartridges used in the shooting. The Commonwealth showed that the shooting took place about nine o'clock. The defendants showed that it took place about half-past ten. The defendants offered to prove by the merchant that when Tressa bought the cartridges she said nothing to him about the shooting, as a circumstance showing that the shooting had not then taken place, for Tressa knew that one of her brothers was killed and the other dangerously wounded. On another trial the merchant should be permitted to testify as to her condition when she came to his store as being excited or otherwise and what she said so far as it may illustrate whether she came there before or after the shooting. The defendants offered to prove that West, while at Pineville on the afternoon before the shooting, had an engagement with another to go to Frankfort that night with him and that when Tressa Messer did not meet him there and he heard of the hunting party he broke that engagement and returned to Barbourville and that night went out to the Messer home. The evidence as to the engagement to go to

Frankfort was excluded by the court but should have been admitted as it was a part of the day's doings. It tended at least to show that the defendants could have had no reason to expect his presence on Lost creek that night. The defendant Smith introduced several witnesses who proved that he was a man of good character for peace and quiet. The Commonwealth's attorney then asked these witnesses if they had not heard that he had had an illegitimate child by his sister-in-law; that he had taken another man's wife to Tennessee and lived with her; that he had been fined for illegally selling whiskey, etc. The witnesses said that they had not heard of any of these things. But the questions should not have been allowed, for none of these things threw any light on his general character for peace and quiet, and the asking of the questions may have had a prejudicial effect before the jury.

In the first instruction to the jury after the word "feloniously" the court will add the words "not in his necessary self-defense or the defense of the home of John Bailey as below defined," so that the instruction will read, "feloniously and not in his necessary self-defense or the defense of the home of John Bailey as below defined," etc. The fourth instruction given by the court should not have been given. There is no evidence in the case showing that the defendant had any reason to anticipate the presence of West on Lost creek that night or that he had in going there any intention of hurting him. There had been no bad feeling of any sort between West and any of the defendants and no facts are shown from which a conspiracy to do him harm may be inferred. He lived 25 miles away; they went quietly to John Bailey's house and had done nothing there to indicate any such conspiracy or any desire to further it.

For the same reason in instruction five on self-defense these words should have been omitted, "Unless you shall further believe from the evidence beyond a reasonable doubt, that the defendant, Gus Smith, was then and there a party to a conspiracy, agreement or arrangement to kill and murder the said Charley West or some other person then and there present with him." Also these words at the conclusion of that instruction: "But should find him guilty of wilful murder and fix his punishment as is set out in instruction No. 2 above." In the sixth instruction after the word "but" these words will be added, "fired a pistol or pistols into the house,"

so that this clause of the instruction will read, ''but fired a pistol or pistols into the house and attempted to enter into the house and home of the said John Bailey against the will and without the consent of the occupants of that home,'' etc.   The court will omit from that instruction these words: ''Unless you shall further believe from the evidence beyond a reasonable doubt that the deceased, Charley West, or such other person or persons as were then and there present and acting with the said Charley West, were enticed to enter the premises of the said John Bailey through the acts or conduct of the defendant, Gus Smith, or any other person then and there present and acting with the defendant, Gus Smith, and shall further believe from the evidence beyond a reasonable doubt that the defendant, Gus Smith, was himself at that time a party to an arrangement or conspiracy to kill and murder the deceased, Charley West, or any other person then and there present and acting with him, in which event you should not acquit the defendant on the ground of the defense of the home of his father-in-law, but should find him guilty of wilful murder and fix his punishment as is set out in instruction No. 2 above.''

There was no evidence that anybody did anything to entice Charley West or those with him to enter the premises.   The rule is well settled that although a conspiracy may exist, the defendant is not deprived of the right of self-defense unless he is present for the purpose of carrying out the conspiracy.   Here Smith was in bed asleep when West and the Messers came there and waked him up, or at least quietly in the house, disturbing no one.   He did not look for them; they looked for him, and no instruction on conspiracy should have been given.

Though West was jailer of the county and, therefore, a peace officer, he was without authority to make an arrest without a warrant, unless for an offense committed in his presence.   No offense had been committed in his presence; in fact the evidence does not show that any offense had been committed, for the shots which he heard are not shown to have been unlawfully fired.   He had a warrant for the arrest of his escaped prisoner, Steve Smith, but he did not go to John Bailey's looking for Steve Smith; he did not ask for Steve Smith when he got there and he summoned the Messer boys to go with him to investigate the shooting.   Steve Smith had not been heard of in that neighborhood, and so far as ap-

pears he had no reason to expect him to be there. He had no right to enter forcibly John Bailey's house for the purpose of investigating the shooting he had heard when no offense had been committed in his presence. On another trial the court will so instruct the jury.

Judgment reversed and cause remanded for a new trial.