[Crim. Nos. 7272, 7329, 7330. Second Dist., Div. Two. June 1, 1961.]

THE PEOPLE, Respondent, v. JAMES PENDLETON
TONEY, Appellant.

(Three Cases.)

712

Walter L. Gordon, Jr., for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

ASHBURN, J.—Defendant Toney appeals from three different convictions of abortion. Those appeals are presented upon separate records and briefs pertaining thereto. In each case appellant asserts insufficiency of the evidence and inadequate corroboration of the testimony of the aborted woman. The facts are so similar and the law arguments so closely parallel that we will dispose of the three cases in a single opinion.

### CASE CRIM. No. 7272

Count I of the information charges appellant and his codefendant Lillian Bruce with conspiracy to commit an abortion (Pen. Code, §§ 182, 274); Count II charges said defendants with commission of an abortion upon one Jeannine Friday on October 13, 1959, also alleges a former conviction of appellant of the crime of abortion. Both defendants were convicted upon each count and the charge of former conviction of appellant found to be true.

Appellant's claim of insufficient corroboration of the alleged abortee, Mrs. Friday, proves to be controlling. Neither defendant testified and the evidence consists only of the testimony of Mrs. Friday, Mr. Harry Reid and Police Officer Paul LePage. Reid clearly was an accomplice for he knew that the crime was to be committed and actively cooperated in accomplishing the result. He was an aider and abettor in the commission of the offense and consequently an accomplice within the meaning of section 1111 of the Penal Code. (*People* v. *Davis*, 43 Cal.2d 661, 672 [276 P.2d 801].)

Mrs. Friday testified with convincing detail that defendant Toney, whom she identified on the witness stand, committed an abortion on her. In brief her story was that, believing herself to be pregnant, she informed her friend Mr. Reid, who arranged with defendant Lillian Bruce to take her to a doctor for the commission of that crime. Pursuant to previous arrangement made between Reid and Bruce, Reid on October 13, 1959, drove Mrs. Friday to Sunset Boulevard and La Cienega in Los Angeles where Bruce was awaiting them. Mrs. Friday transferred to the Bruce car, Reid drove away and

did not further participate in the events of that day. Bruce took Mrs. Friday to the offices of defendant Toney. Before entering, Friday gave Bruce $400, the agreed price, which was in currency tightly folded in such manner that she recognized it lying on the desk in the doctor's office. Later she glanced at the same spot and it had disappeared. The doctor took her into another room and there committed the abortion, an operation that was described in detail by Mrs. Friday. Upon its completion he told her to relax, that it would take 10 or 15 minutes; also that she would have her menstrual period within 24 hours. Soon he said it was all over and she could go home. Mrs. Bruce drove her to her place of residence. Before leaving she asked the doctor if she could call him if anything went wrong; Mrs. Bruce spoke up and said Mrs. Friday could get in touch with her. In about three days Mrs. Friday became quite ill; Reid tried to contact the doctor by telephone, reached Mrs. Bruce and asked her to have the doctor call but he did not do so. To this Reid's testimony added that he later talked to some man who telephoned him, called himself the doctor but gave no name; he said Mrs. Friday's condition was a normal, expected thing. When Reid asked him to come over he refused. Reid never saw Dr. Toney at any time. On the night of the 17th Mrs. Friday was taken to the hospital.

As previously stated, neither Toney nor Bruce testified. The only witness other than Friday and Reid was Police Officer LePage who testified about several conversations with defendant Bruce, but none with Toney. The pertinent portions of those conversations were entertained by the court only as evidence against defendant Bruce. True, LePage talked to her about two of defendant Toney's professional business cards, one of which was found in her purse and the other in her personal telephone directory; he also said she had more than one Toney card in her purse. She asserted that Toney was a friend whom she had known for 9 or 10 years. Asked if she had taken any girls to him to be aborted she said, "only a few." Asked about Mrs. Friday she said she recalled a Jean, but not a Friday, that Jean's name was Dier, which name Reid had testified was his own name spelled backward. As stated above these statements were excluded as to appellant.

Although the aborted woman is not an accomplice (1 Cal. Jur.2d § 5, p. 154; *People* v. *Gallardo*, 41 Cal.2d 57, 63 [257 P.2d 29]; *People* v. *Malone*, 82 Cal.App.2d 54, 68 [185 P.2d 870]), section 1108, Penal Code, says: "Upon a trial for pro-

curing or attempting to procure an abortion . . . the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence.'' [██] The same principles apply to this type of corroboration as to corroboration of the testimony of an accomplice required by Penal Code, section 1111 (*People* v. *MacEwing*, 45 Cal.2d 218, 224 [288 P.2d 257]). ██ It is also established that the corroboration need not go to the corpus delicti, the abortion,—only to defendant's connection with the same. (*People* v. *Clemons*, 182 Cal.App.2d 808, 815 [6 Cal.Rptr. 727]; *People* v. *Ames*, 151 Cal.App.2d 714, 728 [312 P.2d 111].) ██ The necessary corroboration may be furnished by an accomplice. ''Kloster was doubtless an accomplice but that did not disqualify him as a corroborating witness. (*People* v. *Gallardo, supra,* 41 Cal.2d 57, 63; *People* v. *Malone, supra,* 82 Cal.App.2d 54, 68.)'' (*People* v. *Bowlby*, 135 Cal.App.2d 519, 527 [287 P.2d 547, 53 A.L.R.2d 1147].) ██ The corroboration must ''relate to some act or fact which is an element of the offense'' and ''must create more than a suspicion'' though it ''may be sufficient even though slight'' (*People* v. *Gallardo, supra,* at p. 63). ██ However, ''[i]n our opinion both statutes must be construed to mean that corroboration is not adequate if it requires aid from the testimony of the person to be corroborated in order to connect the defendant with the commission of the offense charged.'' (*People* v. *MacEwing, supra,* 45 Cal.2d 218, 225.)

██ Applying these principles to the facts at bar we are forced to conclude that Mrs. Friday's testimony is not adequately corroborated. There is no testimony except hers tending to prove that the offices in which the abortion was effected were appellant's offices. True, the photograph marked Exhibit 1 does plainly designate the building shown therein as the office of ''J P Toney M D Medicine Surgery,'' and though it was introduced in connection with the testimony of Mrs. Friday it doubtless constitutes independent evidence of the fact that defendant did have his office therein, but it still remains true that no one but Mrs. Friday testified directly or inferentially that she was in that particular building. She is the only witness who saw appellant or knows that she talked to him. The telephone call in which some man told Reid that he was ''the doctor'' proves nothing, for there is no direct or indirect proof that appellant was talking. Certainly it would require direction from the abortee's testimony in order

to connect appellant with the crime, for Reid had no personal knowledge of the abortion or who performed it. The possession of appellant's professional cards by Mrs. Bruce, divorced from the conversations concerning same which were received only against Bruce, could do no more than raise a suspicion and that testimony would necessarily require direction from the abortee's testimony before it could supply anything in the way of connecting appellant with the crime. Appellant's failure to testify could not fill the hiatus in the proof. (*People v. Ashley*, 42 Cal.2d 246, 268 [267 P.2d 271].)

The evidence is insufficient to sustain the verdict upon either count.

The judgment in case Crim. No. 7272 is reversed.

## CASE CRIM. No. 7329

Viewed in the light of the principles discussed in connection with case No. 7272, this appeal appears to be clearly frivolous.

Defendant was convicted of performing an abortion upon Barbara Pol on December 12, 1959; a charge of previous conviction of a like offense was admitted. Defendant did not testify and the only witnesses were Mrs. Pol and Ted Lyons.

Mrs. Pol testified that she became concerned in October 1959, about lateness of her menstrual period and consulted Dr. Pruess in Santa Barbara, the city in which she lived. He pronounced her pregnant. She discussed the matter with Ted Lyons and they decided to terminate the pregnancy. Later he gave her a slip of paper bearing appellant's name, office address and telephone number. She called that number on the telephone and asked for Dr. Toney; a man who had answered her call said he was Dr. Toney. She gave him her name and said she would like to make an appointment with him; that she had been late on her period and asked if she could come some time early Saturday morning. He told her that Saturday morning at 10 would be fine. Lyons drove her to Los Angeles on Friday, December 11th, and to appellant's office. He introduced her to appellant. She recognized his voice as the one which had talked to her on the telephone. On the next day, Saturday, Lyons took her again to appellant's office. They entered together and sat down. Defendant told them it would be about 10 minutes and for her to go into the other room, which she did. Lyons remained where he was. After ten more minutes defendant showed Mrs. Pol into his operating room. She was then placed on the table in the familiar position for an abortion, an instrument was used and

she described the sensations caused thereby. The ordeal lasted about 10 minutes and she then was in pain and lay there for a few more minutes. Then she dressed and went into the office where she became nauseated. She gagged and lost some red medicine and had severe menstrual cramps in the back. Appellant placed her on the table and opened her again; gave her pills for nausea and said she would be all right; "Well, will I have a normal period in the morning?" "Yes . . . . It will happen around 8:00 o'clock Sunday morning." After being on the table a second time Mrs. Pol had no pain and went back into the office and told Lyons she was finished. He then went into the other office to pay appellant and they left for Santa Barbara together. On the next day she bled heavily, had hard labor pains for about an hour and thought she passed a fetus (she is the mother of two children and had had miscarriages); for the next two days it was just like having a regular menstrual period. Lyons' testimony corroborated that of Mrs. Pol as to the discussion of pregnancy and terminating it, furnishing her with Toney's name, address and telephone number, taking her to his office, introducing her to appellant, keeping the appointment for Saturday at 10 a. m. He said that Toney on that occasion told them it would be about 10 minutes and they went to the outer office and sat down; soon appellant called Mrs. Pol and Lyons stayed outside. In some 30 minutes she returned, a little weak and dizzy. Lyons went into the other office, asked Toney how much, was told $165 and paid that sum to Toney in cash. It is apparent that Lyons was an accomplice but nevertheless competent to corroborate, and that he did corroborate, the aborted women as to the vital matter of Toney's connection with the crime, the corpus delicti having been established by Mrs. Pol's own testimony.

The judgment in case Crim. No. 7329 is affirmed.

### CASE CRIM. No. 7330

The information charges in Count I the commission by defendant of an abortion upon Joyce L. Webber on June 19, 1959, and Count II alleges commission of a like offense upon Shirley Smith on April 3, 1959. The court in deciding the case orally declared defendant not guilty on Count I but guilty on Count II. The conviction of the Smith charge, Count II, is not supported by any corroborating evidence. There is sufficient corroboration of the Webber offense.

Briefly the proof is as follows. Joyce Webber believed herself to be about three months pregnant and consulted a

doctor who confirmed her suspicion. Through a friend she was given a telephone number which proved to be that of defendant. On June 18, 1959, she dialed that number, a male voice answered ''hello'' and she asked if that was Dr. Toney; the reply was yes. Later when she saw defendant she recognized his voice as the same one she had heard on the telephone. In that conversation she told defendant, ''I have a female problem. I was told that I could contact you and make an appointment to have it taken care of.'' An appointment was made for the next evening at 7 o'clock and Joyce Webber kept it at defendant's office, 9009 South Central Avenue, Los Angeles. A few moments after entering defendant invited her into another room. She said, ''I suppose you know why I am here.'' He said ''Yes,'' inquired when her last period was and whether she was sure of pregnancy. She told him her period was approximately March 22d and she had found out that she was pregnant. Taken into another room she removed her undergarments and was placed on the operating table in position for an abortion. She felt an instrument placed in her vagina to dilate it. In 5 or 10 minutes defendant said he was finished and she could dress. This she did and returned to the consultation room where defendant gave her two kinds of pills with written directions for taking. Defendant also told her she probably would have a cramping in the uterine area beginning about 3 o'clock the next afternoon; that the pains would become greater and closer together just before emission of the fetus. Asked if the price was $175 as Webber had been told, defendant replied in the affirmative, she gave him the money and left the office. About 5 p. m. the next day the cramps began and became worse and closer together until approximately 7 o'clock; the pain became very great and she called for a doctor. A few minutes after making that call she discharged the fetus in the bathroom. In two or three minutes an ambulance and officers arrived. After they took the fetus out of the bowl and were examining it she looked at the same. This witness Webber was not cross-examined.

Officer Danny Galindo of the Los Angeles Police conducted an investigation of this matter. On June 26th he went to defendant's office where, about an hour after defendant had invited a waiting colored woman into the inner office, he invited Galindo to come in. Galindo told him he was Joyce Webber's boy friend who had seen him regarding an abortion the previous week, either on Friday or Saturday; that he was the same fellow who had telephoned him the previous Monday

and arranged to see him; also that he just called defendant around 9:30 that same morning and arranged to see him. He also told defendant that Joyce Webber had visited him the previous week, either Friday or Saturday, for the purpose of having an abortion performed; that she had become very ill and had ended up at the General Hospital; she was relatively new in the county and had been advised at the County Hospital that she would have to move to a private hospital; that would cost $200 and he, Galindo, did not have the money, and he had come to pick up ''this money.'' Defendant wanted to know what had happened to the young lady; ''I told him that she had hemorrhaged severely, that she had passed a fetus at her home and that following that her mother had made every effort to contact him the same Saturday night when she had become very ill at her home.'' Defendant said he was very sorry he was unable to treat her; that he had told the young lady this was to be expected; this hemorrhaging was to be expected and that as a matter of fact she was supposed to expel the fetus. Galindo also told him that Joyce had advised the doctor at the General Hospital that she had fallen and did not say what actually had happened to her; that he was going to have to move her that same day to St. Joseph's Hospital and needed the money because it would cost $208 to begin with. ''I told him that she had paid him $175.00 and I felt that it was only fair that he should return that money. He said that he didn't have $175.00 and that he could only give me $50.00 at that moment. But that the following Monday at approximately that same time as we were talking—this was June the 26th—He'd have the remainder of the money. He went into an adjoining room, or at least he left the consultation office and he returned with two twenty dollar bills and a $10.00 bill and handed it to me. I asked him if he wanted a receipt for this money. He said 'No.' That he'd trust me. And I asked him if it would be necessary for me to bring a hospital record with bills. And he said No, it wouldn't be necessary. I asked him again when I could get the remainder of the $175.00 and he said, 'You come back Monday about this time and I'll have the money ready for you.' ''

Galindo then summoned Sergeant LePage and they placed defendant under arrest ''for performing abortions.'' Defendant ''made no comment.'' Asked if he wanted to discuss the Joyce Webber matter, he expressed a desire to talk to an attorney and that he did. Galindo also testified that he told defendant he had committed an abortion on Joyce Webber

and defendant made no direct comment, just asked what was wrong with her.

Defendant Toney testified that he did talk with Galindo and "he said that he was the boy friend of Joyce Webber and that at that particular time she was in the hospital and that she had told the hospital authorities that she had fallen down the stairs and that he would like for me to give him some money to help with the hospital expenses, and I told him I would. Q. Did he say why he wanted you to give him some money? . . . THE WITNESS: Had been put under pressure at the hospital to make some charge against me and that I—he would appreciate it if I would help him out on the hospital expenses since he was her boy friend and he did not have sufficient funds to take care of the hospital bill. MR. GORDON: Q. Did you give him some money? A. I did. Q. How much did you give him? A. I gave him $50.00 because I told him that I had been under a little trouble before with the law and that I didn't want any trouble or any type of charges or anything because I didn't feel that I could afford to. Q. Did you at any time commit an abortion on Joyce Webber? A. I did not." Defendant also testified that he merely examined Joyce Webber, using only a speculum for the purpose, denied that he gave her any pills or told her she would cramp on the next day. He also said Galindo asked for only $50, said nothing about an abortion or $175. Also that Webber paid him $5.00 for the examination and he received no more money.

▮ The finding of guilty plainly implies rejection of the major portion of appellant's testimony, a matter within the province of the trial judge. (*People* v. *Matlock*, 51 Cal.2d 682, 695 [336 P.2d 505, 71 A.L.R.2d 605].) The corpus delicti was established by the testimony of Webber and defendant's connection with the crime is corroborated by the defendant's admissions as detailed in the testimony of Officer Galindo. There is no room for doubt of the sufficiency of the evidence to prove the commission of this abortion upon Webber by defendant.

Appellant argues only the Webber charge and respondent joins in that argument, concluding its brief with the statement that the judge inadvertently referred to Count I as Count II and intended to find defendant guilty on Count I and not guilty on Count II. The reporter's transcript lends support to this view, for the court referred to "Count II, which involves Joyce Webber" and declared defendant "guilty as to Count II."

At the beginning of the proof of the Webber abortion the following occurred. "THE CLERK: State your name, please. THE WITNESS: Joyce Webber. THE CLERK: Be seated, please. MR. CABALLERO: Your Honor, we are proceeding on Count I now. THE COURT: Very well."

Other pertinent portions of the reporter's transcript read as follows: "THE COURT: What about Count I so far as the question of corroboration is concerned? (Argument was had.)" Referring to *People* v. *Vigil,* 179 Cal.App.2d 182, 186 [3 Cal.Rptr. 479], the court said: "Now, that is a pretty strong statement, but in view of these two preceding statements, it refers back to just one thing, the corroboration which tends to connect the defendant with the crime must be sufficient in itself, and here, I think, certainly as to the Count II, it is; Shirley Webber. MR. BROWN: Joyce Webber. THE COURT: Joyce Webber, yes; Count II, which involves Joyce Webber." Also: "Now, as to Count I, Judge Fricke, in his book, sets forth a number of cases which state that the corroboration required can be shown when we have an Information charging more than one Count by the testimony of one of the women, in one Count . . . . Now, here we have two Counts. We have some similarity in both of them, and I feel that it could well be argued that that is sufficient corroboration. However, I am going to give the benefit of the doubt to the defendant, and I will find him not guilty on the basis of the argument which you have made as to Count I. I will find him guilty as to Count II." "THE COURT: You were heretofore charged in Information 217352 with a violation of 274 of the Penal Code in two counts with one prior conviction for the crime of abortion. You were thereafter found not guilty as to Count I but guilty as to Count II. . . . Is there any legal cause why judgment and sentence should not now be pronounced in this matter? MR. GORDON: No legal cause, your Honor. THE COURT: Is there anything you want to say, Counsel? MR. GORDON: No, your Honor. I think the reports are revealing and I have nothing to say. THE COURT: All right, probation is denied and the defendant is sentenced to the State Prison for the term prescribed by law, and remanded to the Sheriff for delivery to the State Reception Center at Chino, California."

■ It should be borne in mind that the numbering of the charges of a multiple accusation is not required by statute or decisions; that that is but a convenience for identification and absence of numbering of the counts does not affect the

validity of an indictment or information in any degree. (42 C.J.S. § 35, p. 894; *Wright* v. *State*, 53 Ga. 371 [186 S.E. 149, 150-151]; *Smith* v. *Commonwealth*, 206 Ky. 728 [268 S.W. 328, 329]; *Lee* v. *State*, 81 Ga. App. 829 [60 S.E.2d 177, 178].) Hence, the numbers may be disregarded whenever desirable for clarification. ▮▮▮▮ Misstating the number of any count cannot control over the substance, e.g., the charge of abortion of Joyce Webber.

In *People* v. *McKinney*, 71 Cal.App.2d 5 [161 P.2d 957], it is said: "These separate verdicts, as to each defendant, read as follows: 'We, the jury in the above-entitled action, find the defendant . . . guilty of receiving stolen property.' 'We, the jury . . . find the defendant C. S. McKinney guilty of conspiracy to receive stolen property.' It will be noted that neither verdict recites: 'as charged in the first count of the information,' or 'the second count.' Appellants contend that this omission is fatal and reversible error resulted. . . . Proper pleading would require that the verdict make adequate reference to the information and counts specified therein under which the issues were presented by the plea of not guilty. . . . There are innumerable authorities which declare that the form of the verdict is immaterial if the intention to convict of the crime charged is unmistakably expressed." (P. 13.) "The form of verdict should be construed in connection with the information and the plea of the defendant." (P. 14.) "Under the facts related, it seems clear to us that the jurors were fully instructed as to the nature of the charges against the defendants and that the intention of the jury to convict the defendants of the offenses charged in the information is unmistakably expressed and sufficient in form and substance to apprise them of its conclusions as to the issues presented." (P. 15.) "We are firmly convinced that the defendants were not prejudiced by the claimed error or omissions in the form of verdicts. Considering the evidence, the pleadings, instructions, verdicts and the merits of the case, no miscarriage of justice resulted." (P. 17.)

It seems clear to us that the trial judge had the Webber offense in mind primarily, for that is the substantial aspect of the matter; seemingly it was a slip of the tongue when he designated it Count II. His reasoning points to Count I as the charge on which defendant was shown to be guilty and the Shirley Smith charge as uncorroborated and demanding acquittal.

Counsel for defendant voiced no objection to the sentencing

of his client and, as stated above, argues his appeal as if the Webber charge were found in Count II of the information.

The clerk's minutes say: "The Court finds defendant 'Not Guilty' to Count 1 and 'Guilty' to Count 2." The formal judgment makes no mention of acquittal on either count (see Pen. Code, §§ 1165 and 1207), and so far as pertinent it reads: "Whereas the said defendant having been duly found guilty in this court of the crime of Abortion (Sec 274 PC), a felony, as charged in Count 2 of the information and admitted prior conviction as alleged. . . . It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the State Prison for the term prescribed by law. . . ." Defendant appealed "from the judgment entered in the above-entitled matter and from the whole thereof."

Respondent asserts that "The judgment should be affirmed, with correction of the record to show that appellant was found guilty on Count I and not guilty on Count II." Also: "Since the court obviously found appellant guilty of an abortion committed upon Miss Webber, we submit that appellant has not been prejudiced with respect to any substantial right. (Pen. Code, § 1404.) The court, on appeal, may affirm or modify a judgment appealed from. (Pen. Code, § 1260.) We submit, accordingly, that this Honorable Court may affirm the judgment as though appellant had been convicted under Count I (the one concerning Miss Webber), and that the cause may be remanded to the Superior Court for correction of its minutes and judgment." We find however that no correction of the record is essential.

Undoubtedly counsel's statement of "no legal cause" and his saying that he had nothing to say with respect to the sentencing constituted a waiver of any objection to defendant being sentenced upon the actual charge under the misnomer of Count II. (Cf. People v. Selz, 138 Cal.App.2d 205, 208 [291 P.2d 186]; People v. Williams, 155 Cal.App.2d 328, 333 [318 P.2d 106]; People v. Thomas, 45 Cal.2d 433, 438-439 [290 P.2d 491]; 4 Cal.Jur.2d § 585, p. 461.) This is emphasized by the presentation of the instant appeal without any mention of the transposition of count numbers and upon the basis of insufficiency of the corroboration of the witness Webber and resulting insufficiency of the evidence to support a conviction. Obviously counsel for appellant construed and construes this judgment to be one convicting defendant upon the Webber charge.

Section 960, Penal Code, says: "No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits." Section 1258: "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties." Section 1404: "Neither a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right." The application of these sections has been exemplified in numerous cases. " 'Inconsequential inaccuracies or omissions in a record cannot prejudice a party; if in truth there does exist some consequential inaccuracy or omission, the appellant must show what it is and why it is consequential.' " (*People* v. *Fuentes*, 132 Cal.App.2d 484, 488 [282 P.2d 524].)

In *People* v. *Smith*, 151 Cal.App.2d 294, 297 [311 P.2d 149], the court, after a nonjury trial, pronounced defendant guilty of burglary in the first degree. In sentencing defendant the judge referred to second degree burglary. On appeal it was contended that the judgment was erroneous in that it recited burglary in the first degree. Rejecting this contention the court quoted a Florida case as follows: " ' ' "The entire record may be looked to in ascertaining the offense for which the accused is sentenced, and an erroneous recital or statement of the offense by the court in pronouncing sentence, or of the clerk in recording in the minutes of the proceedings kept by him the judgment imposed, will not vitiate the judgment when the record fully discloses the offense for which the accused was indicted, tried and convicted. In such case the record furnishes a complete protection against another prosecution for the same offense." ' . . . By parity of reasoning, an erroneous statement of the degree of the offense would come within the same principle. We conclude that in this case there was a judgment of conviction for the offense of burglary in the first degree as shown by the entire record, notwithstanding the erroneous statement by the court in pronouncing sentence." After quoting section 1404, Penal Code, this court further said: "The mistake of the trial court in erroneously stating the degree of the offense at the time of judgment and sentence neither prejudiced nor tended to prejudice the de-

fendant as the record is clear that he was convicted of burglary in the first degree." (P. 298.) Further, to the same effect, see *People* v. *Becker,* 80 Cal.App.2d 691, 694-695 [181 P.2d 958] ; *In re Basuino,* 22 Cal.2d 247, 250-253 [138 P.2d 297] ; *People* v. *Murback,* 64 Cal. 369-372 [30 P. 608] ; *People* v. *Kelly,* 120 Cal. 271, 274 [52 P. 587] ; *In re Mize,* 11 Cal.2d 22-25 [77 P.2d 472] ; *People* v. *Swift,* 140 Cal.App. 7, 10 [34 P.2d 1041] ; *People* v. *Hawthorne,* 63 Cal.App.2d 262, 266 [146 P.2d 517] ; *People* v. *Henry,* 86 Cal.App.2d 785, 790 [195 P.2d 478].

The clerk carried into his minutes only half of the judge's finding of guilt, referring to the charge only by count number and making no reference to the fact that it was a finding upon the Webber charge. We think this is a case in which the reporter's transcript plainly prevails over the clerk's minutes (*People* v. *Davis,* 133 Cal.App.2d 558, 561 [284 P.2d 496] ; *People* v. *Smith, supra,* 151 Cal.App.2d 294, 297), and that the judgment herein, properly construed, is one of conviction upon the Webber charge and nothing else.

It is true that the trial judge had and has the power to correct the record *nunc pro tunc,* if so advised, for a "clerical error" such as an inadvertence of the judge (*Meyer* v. *Porath,* 113 Cal.App.2d 808, 811-812 [248 P.2d 984] ; *Estate of Remick,* 75 Cal.App.2d 24, 28 [170 P.2d 96] ; *LaMar* v. *Superior Court,* 87 Cal.App.2d 126, 130 [196 P.2d 98] ; *Brashear* v. *Gerbracht,* 128 Cal.App.2d 263, 268 [274 P.2d 933] ; *Minardi* v. *Collopy,* 49 Cal.2d 348, 353 [316 P.2d 952] ) may be corrected *nunc pro tunc* notwithstanding the pendency of an appeal (*Fay* v. *Stubenrauch,* 141 Cal. 573, 575 [75 P. 174] ; 29 Cal.Jur.2d § 107, p. 21), and in proper cases upon the basis of the judge's own recollection. (*Meyer* v. *Porath, supra,* 113 Cal.App.2d 808, 811-812; *Bastajian* v. *Brown,* 19 Cal.2d 209, 214-215 [120 P.2d 9] ; *Kohlstedt* v. *Hauseur,* 24 Cal.App.2d 60, 62, 63 [74 P.2d 314].)

As above indicated we have concluded that defendant was found guilty of the abortion charge involving Joyce Webber, that this is the proper interpretation of the judgment, and with this understanding said judgment is affirmed.

Fox, P. J., and McMurray, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.